(34 South. 718.)

No. 14,296.

CRISMAN et al. v. SHREVEPORT BELT RY. CO. et al.*

(Dec. 15, 1902.)

STREET RAILWAYS—INJURY TO PERSON ON TRACK—NEGLIGENCE—EVIDENCE.

1. It is negligence, on the part of an electric railway company whose line traverses a city, to have one of its cars in the charge of a young man only 18 years old, whose experience in the handling of an electric car dates only 20 days back.

2. For the shortcomings of such a motorman, in a case where the death of a human being has ensued, the car company will be held to the strictest accountability; and doubt as to whether the life of the deceased might not have been spared had the car been in the hands of a more experienced and more competent motorman will be construed against the car company.

3. The situation having been that the street was one thoroughfare, with continuous pavement from curb to curb, the car track being in the center, the rails laid flush with the surface, and nothing setting them off from the rest of the street, and that as the car ran the deceased was riding on horseback somewhat ahead of the car, close enough to the track for his proximity to challenge attention (not so close, however, as to be within the line of danger), and that the car was gaining upon him, and that the street was somewhat crowded—*held*, first, it was not negligence under the circumstances not to have checked the speed of the car before the actual emergency had arisen; secondly, it was incumbent on the motorman, under the circumstances, to prepare for emergencies by turning off his current and winding the slack out of his brake, and the failure to do the latter was negligence.

4. From the fact that the car was not stopped within the space within which it was possible to stop it, there arises an inference that the motorman was not as prompt or as energetic as it was possible for a motorman to be, and this inference overcomes the statement of witnesses that the motorman did all that was possible to stop the car.

Nicholls, C. J., and Monroe, J., dissenting.

(Syllabus by the Court.)

Appeal from First Judicial District Court, Parish of Caddo; Alfred Dillingham Land, Judge.

Action by Mattie Crisman and others against the Shreveport Belt Railway Company and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

*Rehearing denied June 22, 1903.

William Henry Wise and Edward Beverly Herndon, for appellants. Holbert & Barret, for appellees.

PROVOSTY, J. The defendant companies operate the street electric railway system of the city of Shreveport. James P. Crisman was run over and killed by one of their cars, and his widow and the tutor of his minor son bring this suit in damages for his death and for the sufferings he underwent.

The circumstances of the accident are these: The deceased was on horseback, going in the same direction as the fatal car, to the right of the motorman, not so close to the track as to be within the line of danger, but close enough to induce the motorman to sound the gong in order to warn him of the approach of the car. How far he was ahead of the car when attention was first attracted to their juxtaposition is variously estimated by the witnesses, some placing him parallel, and some 90 feet ahead. From the evidence as a whole, we gather that he was ahead of the car, and that it was gaining upon him. When he had reached a point 20 feet from the line that would be formed by projecting across the path of the car the near sidewalk of the cross-street ahead, which was Murphy street, his horse, by a sudden movement to the left, went upon the track 10 to 15 feet ahead of the car, and the car, despite the efforts of the motorman to stop it, ran upon him.

He was thrown upward, and he fell to the side of the car, fracturing his skull in the fall. Also one of his legs was run over by the car. The horse was thrown to the ground, the front platform of the car passed over him, and the front truck pushed him along the ground until the car came to a stop. When the car was backed from over him he rose and walked off, not seriously injured. Crisman himself was found to be unconscious. He died about four hours afterwards, without having regained consciousness.

Plaintiffs allege negligence on the part of the defendant companies in the following respects: (1) That in approaching the Murphy street crossing, where the accident occurred, the motorman should have had, and did not have, his car under control, current off, and slack out of his brake, ready for any emergency. (2) That the speed of the car was excessive. (3) That the motorman was not competent. (4) That he did not see Crisman in time to stop the car. (5) That the car was not properly equipped with fenders and safeguards.

Defendants plead the general denial, and specially that Crisman was intoxicated, and by his gross carelessness and negligence contributed to the accident.

The theory that Crisman was under the influence of liquor, and was racing with the car, and tried, with the foolhardiness of a drunken man, to cut across the path of the car, fails in the presence of the clear disproof of the drunkenness. Nor is his getting in the pathway of the car chargeable as negligence. The car tracks on Texas avenue, where the accident occurred, are not set apart from the rest of the street; in fact, nothing marks the pathway of the cars except the rails laid flush with the surface; the street is one thoroughfare, with pavement continuous from curb to curb, saving the double car tracks in the center flush with the surface. The street was as free to Crisman as to the car, apart from his obligation to yield the road to the mechanically propelled and more ponderous and unwieldy public vehicle. His riding near the track was not negligence, so long as he kept without the line of danger.

What caused him to deviate is not clear, but we have no sufficient reason to believe that he voluntarily put himself across the path of the car. We think that the most plausible theory, the one that will come nearest to reconciling the widely varying statements of the witnesses, is that a buggy with a lady in it coming towards him caused him to deviate towards the track, and that the motorman seeing him do so sounded the gong violently, and that at this the horse became frightened and unmanageable, and went upon the track, and could not be induced to get off in time to avoid the collision. The witnesses pretty well agree that at the moment of the collision the horse was unmanageable and would not get out of the pathway of the car, despite the efforts of the rider with heels and arms to urge him to do so.

Coming to the discussion of the alleged negligence of the defendants, we put aside

110 LA.—21

at once the allegations respecting the locus in quo, the speed of the car, the inattention of the motorman, and the absence of a fender.

Except the statement of the motorman that "the street was somewhat crowded at the time," we find nothing going to show anything special about the intersection of Texas avenue and Murphy street why the speed of the cars should be checked there any more than at any other crossing in the built-up portion of the city.

The car was not being run at negligent speed. The current had been turned off 180 feet back in passing another car going in the opposite direction on the other track alongside to the left of the motorman, and had not been returned; and the grade was ascending at the rate of $1^1/_7$ feet per 100 feet. What was the actual speed cannot be arrived at from the statements of the witnesses, which vary from 3 to 25 miles. Adopting the statement of the witness Levinson, based on an experiment made for the purpose of forming an estimate, the speed was about 8 miles an hour. We will say, however, that this witness is the superintendent of the defendant companies, and is evidently strongly enlisted on the side of the defendants, and that we adopt his statement simply for the want of anything more reliable to go by.

The evidence shows conclusively that the motorman was attentive, that he sounded the gong as a warning to Crisman riding alongside of the track, and that he sounded the gong promptly and violently as soon as Crisman deviated towards the track.

The evidence shows also that the ordinary fender has been found to do more harm than good, and is being discarded, and that there is being adopted in its place a contrivance such as the car in question was provided with, or something approximately like it.

Coming to the incompetency of the motorman, we find that he was a young man 18 years and 1 month old, 5 feet 8 inches tall, and weighing between 125 and 130 pounds, who 20 days before had entered the service of the defendants—a raw hand; that after the accident he went into the car and sat down, unnerved, so that the conductor had to take charge of the car and back it from over the horse.

Relatively to what should be the age and weight of a man to qualify him to serve as motorman, four superintendents of the electric street railway systems of different cities were examined as witnesses in the case. Three of these testify positively to the importance of the age qualification, fixing the lower limit at 20 years; one testifies that there is no definite age requirement. They divide on the importance to be attached to weight, two saying that a motorman should weigh at least 150 pounds, and two that weight is immaterial.

It would hardly do, we think, for this court to undertake to prescribe the weight and height of motormen, under the penalty of negligence to the railway companies; but age is a different thing. The law takes age into consideration, and fixes at 21, when a man shall be considered sufficiently mature to be intrusted with the management of his own affairs, and we find these superintendents, out of their experience, attributing to age great importance.

The intrusting of this car to a man so young and inexperienced was negligence on the part of the defendant companies, and the question must be whether between this incompetency of the motorman and the injury there was any causal connection.

Having found that the situation was not such as to require the checking of the car, also that the current had been turned off, also the motorman was not inattentive, we have to consider, in tracing this causal connection, what else a fully qualified motorman would probably have done that this young man did not do.

From his own statement we conclude that he did not have the slack out of his brake. He says: "When I saw him get closer to the track he was between ten and fifteen feet from the track, the outside rail. Then he commenced getting up closer, and I saw we would run into him, and tried to check the car. I was about 10 or 15 feet when I saw he was likely to cross there. I already had the current off, and commenced taking off the slack." Thus it appears that he "commenced taking off the slack" only when he "tried to stop the car." Therefore he had not taken it off up to the moment of actual emergency. True, he says he began taking off the slack as soon as he saw Crisman

·deviate, and that at that moment Crisman was between 10 and 15 feet away from the track; but this would place Crisman nearer to the curb than to the track, since the street was less than 20 feet wide from track to curb, and all the witnesses agree that ·Crisman was near the track, in fact, so close that the question is whether he was not within the line of danger, and the same motorman in his report to the defendant companies says that Crisman's horse came upon the track by a sudden movement—"shied" upon it.

As Crisman rode near the track, slightly ahead of the car, the imminency of the danger was not such as to necessitate the checking of the car, but it was certainly such as to make it obviously prudent to resort to ·such precautions as turning off the current ·and winding the slack out of the brake in order to be as ready as possible for emergencies.

, The motorman did the former—whether ·specially with reference to Crisman is immaterial—but he failed to do the latter, and his failure in that regard is another point ·on which, we think, negligence has to be imputed to the defendant companies, his ·employers, responsible for his conduct.

On the point of whether the current should ·have been reversed, we think the testimony preponderates against the advisability of ·that measure under the circumstances.

Notwithstanding that several witnesses say that the motorman was prompt, and that he ·did all that could be done to stop the car, we find that the car was not stopped as promptly as was possible. One of the superintendents referred to above says that a car should be stopped within 50 feet, and another that it should be stopped in from 20 to 50 feet. Now, the car traveled a distance of ·64 to 79 feet before coming to a final stop. We arrive at these figures by adding together the following distances: 10 to 15 feet, ·distance Crisman was ahead of the car; 10 to 20 feet, distance from point of collision to Murphy street; 30 feet, width of Murphy ·street; 6 feet, width of far sidewalk; and 8 feet, distance attained by the front end of ··the car.beyond the property line on the far ·side of Murphy street. Now the superintendents, in their said estimate of the space .required for stopping a car, have reference

to a car with brake loose and current on, and going full speed upon a level track; whereas in the instant case the current had been cut off 180 feet back, and the car was moving up a $1\frac{1}{7}$ per cent. grade, and from the time of the collision had a prostrate horse under its front platform serving as a bumping post, and full opportunity had been afforded for taking the slack out of the brake. In the hands of a more competent motorman, then, the car would presumably have been stopped in less than 50 feet, whereas in the hands of this young man it ran to a distance of 64 to 79 feet. Either the young man was not as prompt, or he was not as energetic, as a fully qualified and more competent motorman presumably would have been.

The question remains, however, whether, considering the speed of the car and the short space of 10 to 15 feet within which to stop it, the casualty could have been avoided even by the most efficient motorman. If it could not, the shortcomings of the motorman were not the cause of the accident, and the defendants are not responsible. Instances are cited in the record where, under circumstances well-nigh as desperate, when a fatal outcome seemed as inevitable, a serious result was averted by the efficiency of the motorman; and the mind hangs in doubt whether, had the slack been out of the brake, and that modicum of greater promptness, or of greater energy, been used which would have brought the car to a stop within a few feet less, or, in other words, which would have checked the impetus of the car by that much more, the fatal result might not have been avoided—Crisman might not have been let off with a mere harmless bumping.

That doubt must be resolved, we think, against defendants. The presumption is that had the motorman been competent the slack would have been out of the brake, and this modicum of greater promptness or energy would have been used, and Crisman would have had that much better chance for his life; and, problematical as that chance was, defendants could not deprive him of it, and the presumption is that by employing this incompetent motorman they did so. The defendants, who for their own profit put in motion a dangerous agency by which the life , of a human being, a citizen, a father and a husband, has been taken, must be held to a

strict accountability, and, so holding them, they are responsible for the death of Crisman.

The burden of proof, both as to negligence and as to causal connection, rests on the plaintiffs, but they have discharged same when they have shown that by the fault of the defendants in employing an incompetent motorman the deceased was deprived of a chance for his life—problematical though that chance was—which presumably he would have had if the motorman had been more competent.

The petition of the widow charges damages as follows: For burial expenses, etc., $146; for being deprived of the support and maintenance of her husband (who was earning $90 to $120 per month at the time of his death), and for being deprived of his companionship, $10,000. The minor sues for the pain, agony, and suffering endured by his father while he lingered between life and death; also for being deprived of his care, instruction, protection, etc.—$10,000.

The deceased was 49 years old, a strong, vigorous, healthy man, in perfect health at the time of his death. He was a mechanic and builder and contractor, and earned from $4 to $5 a day. During his life he provided comfortably for his family, but laid aside nothing, so that he left no estate. The widow is 42 years old, and is now dependent upon her personal exertions for a livelihood, having no property. The minor is 18 years old.

The jury allowed $4,646 to Mrs. Mattie Crisman, and $300 to the minor, Robert Percy Crisman.

The allowance to the minor was, we take it, for the pain and suffering of the deceased in the four hours that intervened between the accident and his death. Defendants contend that deceased became insensible instantaneously, and that consequently no damages can be recovered on this head. The facts are as follows: Crisman, by the impact of the car, was thrown upward, and he fell to the pavement. He was heard to exclaim, "Oh Lord!" After the accident he was found to be unconscious, with his skull fractured and his leg crushed. While on the ground he was heard to groan. He was taken at once to the Charity Hospital near by. It was found that the occipital bone had received a stellated fracture, and that the bone was pressing upon the cerebellum; also that the part of the upper right jawbone in which the teeth are imbedded was broken and loose. The operation of trepanning was performed, and the leg amputated below the knee. On account of the imperfect and difficult breathing, described as "stertorous," and in view of the fact that the patient was unconscious and motionless, no anæsthetic was administered. During the operation he vomited. After the operation his breathing improved, and he was able to move his head and hands, and he also sighed or moaned. He remained unconscious, however, until his death at 10 o'clock the same night, four hours after the accident. Dr. Randall Hunt, the surgeon in charge of the Charity Hospital, who attended to the case and performed the operation, gives it as his positive opinion that the sense of feeling in the wounded man was not dead, and that he endured pain during his unconsciousness. Dr. J. C. Eagan, called as an expert by defendant, seems to doubt the correctness of this opinion, but he does not commit himself to the contrary view. Being asked, "Would you say, Doctor, that a moan or sigh or groan under the circumstances related to you here would indicate suffering?" He answered, "According to my impression, it would; but it simply is an impression." Especially the vomiting while the operation was going on, Dr. Hunt would take to have been a reliable sign of the persistence of sensation. It is not for us to follow these gentlemen into the reasons they give for their opinions, nor, we imagine, would the learned dissertation of Dr. Hunt on the subject of subconsciousness, however clear and interesting in itself, be of any service here; suffice for us to consider the preponderance of the evidence, and it is to the effect that the wounded man continued to endure pain.

Plaintiffs and appellees have filed in this court an answer praying for an increase of the amount allowed by the jury, especially to the minor. The estimation of the money value of the pain and suffering of a human being is a matter for which there can, in the nature of things, be no fixed rule. Courts are not in the habit of allowing a very large amount in cases into which there enters no element of punishment or of example.

Defendants, on the other hand, ask a reduction of the verdict. Under the circumstances of the case, we should not feel justified to change the verdict.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed.

NICHOLLS, C. J., and MONROE, J., dissent.