(79 South. 557)

No. 21350.

━━━━━━

(79 South. 557)

No. 22408.

ELMENDORF et al. v. CLARK.

(Nov. 26, 1917. On Rehearing, June 29, 1918.)

(Syllabus by the Court.)

1. MUNICIPAL CORPORATIONS ⬤⟳705(11)—VI-
OLATION OF ORDINANCE—PROXIMATE CAUSE.

Where the owner of an automobile places
in charge of it a chauffeur who does not possess
the age qualifications required by a city ordi-

[1] Ante, p. 962.

nance, and the chauffeur fails to keep a proper
lookout for the safety of children whom he sees
playing upon a sidewalk bordering upon the
street, and upon the side of the street upon
which he is about to drive the machine, and neg-
ligently and in violation of the ordinance at-
tempts to pass the children without sounding his
horn and at a prohibited rate of speed, with the
result that one of the children, getting suddenly
in the street, in the course of their play, is
knocked down by the machine and fatally in-
jured, such owner will be held liable in damages
to the parents, for the injury to and death of
the child. There is, in such case, a direct re-
lation of cause and effect between the violations
of the prohibitory ordinance and the injury in-
flicted.

Leche, J., dissenting.

On Rehearing.

(Additional Syllabus by Editorial Staff.)

2. MUNICIPAL CORPORATIONS ⬤⟳706(5) — IN-
JURY FROM AUTOMOBILE — CONTRIBUTORY
NEGLIGENCE—EVIDENCE.

In an action for damages by the parents of
a boy, killed by defendant's automobile while his
chauffeur was attempting to pass at a prohibited
speed, held, on the evidence, that the accident
was attributable to the boy's negligence.

3. MUNICIPAL CORPORATIONS ⬤⟳705(10)—IN-
JURY FROM AUTOMOBILE — CONTRIBUTORY
NEGLIGENCE.

Negligence, resulting from the violation of
an ordinance fixing the age of a chauffeur, af-
fords a cause of action only in the absence of
contributory negligence on the part of one struck
and killed by the automobile.

4. MUNICIPAL CORPORATIONS ⬤⟳705(10)—IN-
JURY FROM AUTOMOBILE — CONTRIBUTORY
NEGLIGENCE—LAST CLEAR CHANCE.

Negligence, resulting from the violation of
an ordinance fixing the age of chauffeur, affords
a cause of action only if, after the contributory
negligence of the one struck had ceased, there
was a last clear chance of avoiding the accident.

Monroe, C. J., and O'Niell, J., dissenting.

Appeal from Sixth Judicial District Court,
Parish of Ouachita; Ben C. Dawkins, Judge.

Action by George H. Elmendorf and anoth-
er against O. O. Clark. Judgment for de-
fendant, and plaintiffs appeal. Judgment
affirmed.

R. F. Liebler, of Alexandria, and George
Wear, Jr., of Jena, for appellants. Stubbs,
Theus, Grisham & Thompson, of Monroe, for
appellee.

Statement of the Case.

MONROE, C. J. This is an action in damages by the parents of a boy, who lost his life by reason of his being struck by an automobile operated by the minor son of the defendant, and the matter comes to this court upon an appeal by plaintiffs from a judgment rejecting their demand.

The facts, as we find them disclosed by the evidence in the record, are as follows:

The accident occurred on De Siard street, the principal business thoroughfare of the city of Monroe, in the evening of Christmas day, 1915, at about 5:30 or 6 o'clock, and it is admitted that the sun set at 1 minute past 5 on that day. The store windows were lighted at the time of the accident, and probably the street lamps, and it is contended on behalf of defendant that the lights upon his automobile (which was a Hudson 4, and, for convenience, will be called a car) had been turned on, but the evidence is radically conflicting on that point, and we shall pass it without decision. Defendant lived in West Monroe, which lies upon the west side of the Ouachita river, opposite the city, and is connected with Monroe by a bridge which spans the river at the end of De Siard street. He had been out for several hours with his car upon the east side of the city, and at the time of the accident was returning home, going westward, on the north side of De Siard street, which is separated by a street car track, from the south side, and was the proper side for him to use, going in that direction. The acting chauffeur of the car was his son, who had attained the age of 17 years some 3 or 4 months before, and was operating the car from the chauffeur's position, which, on that particular car, was upon the right end of the front seat, the left end having been occupied by defendant's brother-in-law, Mr. Maroney, and the back seat by defendant and three of his friends, to wit, Mr. McLeod to the right, Mr. Whitfield in the middle, and defendant to the left, with Mr.

Henry seated upon his knees. As the car approached the scene of the accident, the horn was sounded at a point about 150 feet distant, and was not sounded afterwards, and Whitfield and Henry testify that, from that distance, they saw a "bunch" of boys on the north sidewalk; Whitfield being unable to say whether they were playing, or merely standing, and Henry saying:

"I was not looking right up the street. I was looking sort of up the sidewalk at those boys. I had my eyes on the boys. They were playing —hunting each other. I was looking at the boys, thinking about how my boys used to be Christmas time—playing on the sidewalk."

McLeod saw them from a distance of 20 steps, and says that they were "tagging" at each other. Defendant, being on the left end of the back seat, with Henry on his knees, did not see the boys. "Jimmie" Clark (the acting chauffeur) saw them from some distance, not stated, "walking down the street," and he says "they started playing," and that he "didn't see them, after that," until just a moment before the accident, when he saw the Elmendorf boy leave the sidewalk, but with his face turned in that direction, and come towards the car, by which he was knocked down and so injured that he died. Maroney "didn't see any children, or any one on the sidewalk, until this little Elmendorf boy left the curb."

The car, we are satisfied, was moving at a rate exceeding 8 miles, and probably as high as 10 miles an hour, and upon a line not less than 6, and probably 8 feet from the curb. The boy was struck by the metal piece which serves as a bumper, upon the thigh of the right leg, breaking the femur, knocking him down, and thereby fracturing his skull. The car, some 12 or 14 feet in length, passed over him, and when it was stopped he was found with his feet under the rear axletree and his body extending back, to the eastward. He was 10½ years of age, and had been sent by his mother to the baker's to get bread for

supper, and, the baker not being ready with his bread, he met several other boys of about the same age, one or two of whom were on the same errand, and they seem to have engaged in what might be called sky-larking with each other, playing "tag," as one of the incidents of which amusement little Elmendorf playfully kicked another of the boys, and, naturally expecting a return in kind, or of some kind, backed or sidled away, off the sidewalk and into the street; our conclusion, from the testimony and from the fact that the bumper, or guard, of the car struck him on the right leg, being that his movement was rather a sidelong one, in a southeasterly direction, and that he kept his face turned towards the boy from whom he was retreating, but who was prevented from following by the desire to comply with a request from another member of the party to show him a pair of new boots that he had probably received as a Christmas gift, and which were somewhat obscured by an overcoat. It was perhaps on that account that the movement was not a very rapid one, and it is not surprising, under the circumstances, that there should be some variance in the testimony as to whether it was backward, forward, or sideways. One or two of the boys say that the little chap backed slowly; another, that he ran. Young Clark, the acting chauffeur, says:

"He was coming towards me with his head down, looking back, and he struck the street, about running. * * * He was going at a moderate gait."

It will be understood that the boy and the car were approaching the same point, the one moving in a southeasterly, and the other in a westerly, direction, and that, as we think, when the boy suddenly found that the car was bearing down on him, he made an attempt to escape it by a turn to his left, thus presenting his right side, upon which he received the impact of the car. After that he was taken to a sanitarium, where he lingered,

with intervals of consciousness and suffering, until the following evening, when he died.

The city ordinance in force at that time prohibited the operation of motorcars, in Monroe, without licenses, and prohibited the owners of such cars from permitting any one under 18 years of age, or not licensed as a driver or chauffeur, to use or operate them, and also made it unlawful for any one to operate such a car in that part of the city at a higher rate of speed than 8 miles an hour. It is admitted that young Clark was under 18 years of age, and that he had been operating the car in question, with defendant's consent, for some 2½ years, and several witnesses testified that they considered him a careful operator.

## Opinion.

It may be conceded that the mere violation of a city ordinance by one citizen does not afford another a ground of action in damages, unless some direct relation of cause and effect between the violation and the damages can be traced with reasonable certainty; and, if it were shown that the injury here complained of would have been sustained, even though defendant's car had been operated by a lawful chauffeur, at a lawful rate of speed, and that the chauffeur had been guilty of no negligence, defendant would be entitled to judgment in his favor, notwithstanding that, in fact, the car was operated by an unlawful chauffeur, at an unlawful rate of speed. But no such showing has been made. To the contrary, we find warrant in this record, as well as in common reason, for the conclusion that, if an older, more cautious and experienced, chauffeur had been driving the car, and had seen, approaching him, on a sidewalk raised but a few inches above the street, a "bunch" of boys, inspired with Christmas hilarity, he would not have taken his eyes off of them when they began to play "tag," but would have assumed that

their activities might lead them suddenly into the street, and would have regulated the speed and direction of the car, and have sounded his horn, with reference to that probability. Moreover, it seems quite certain that, if the car had been traveling even a shade slower, it would not have reached the point of collision at the moment that the boy reached there, and that there would have been no accident.

Mr. I. E. Petit, a witness called by plaintiffs, and who may be said to have qualified as an expert in the driving of automobiles, testified as follows, on cross-examination:

"Q. In your experience in driving cars on the streets of Monroe, is it not the most dangerous practice that you know of of children jumping suddenly from the sidewalk? A. Worse than it is in a city 400 times as big as this. Q. Is that not the most dangerous feature in driving in Monroe—the most dangerous feature of traffic? A. Yes, sir."

His re-examination in chief reads in part:

"Q. I understand that you say that Monroe is * * * severely afflicted with people who make a practice of darting off the sidewalks in front of automobiles. If that be true, would not that fact—with a bunch of children, from 4 to 14 years of age, playing on the sidewalk—from your experience, would not that cause the ordinary driver to be unusually watchful? A. The trouble with the drivers— If a man were always driving—ordinary drivers—I don't think it would make any difference. I do, because I am driving 200 times up and down the street, all the time. * * * Q. Is it well known among automobile drivers that children are apt to turn out on the street? A. I don't know about all persons. I know it is. It is well known to me, because I have been driving—not only children, but grown people."

He further testifies that a car driven along the street should carry a headlight and a horn, and that the horn should be sounded at reasonable intervals.

We have it, then, drawn out by defendant's learned counsel, that the most dangerous feature of automobile driving, in Monroe, is the practice of the children of jumping from the sidewalks, and, otherwise from the witness, that it is the duty of a prudent chauffeur to be on the lookout for incidents of that kind; and yet the chauffeur in this case saw the children, playing on the sidewalk, could have seen, as others in the car saw, that they were playing "tag," a game which requires active scampering around and getting out of each other's reach, and then saw them no more (though there was nothing to obstruct his view) until one of them left the sidewalk, backing, or sidling, in the direction of the car, when he found it impossible to avoid the deplorable tragedy which then resulted.

It is true that he testifies that he had reduced his speed to about 5 miles an hour, and Mr. Whitfield gives similar testimony; but Mr. Maroney says that the speed was 8 or 10, and Mr. McLeod, that it was 10 or 12, miles an hour, and the boys, that it was unusually high; on the other hand, the acting chauffeur can give no reason why, taking people to their homes at that hour in the evening, he should have traveled at so slow a pace as 5 miles an hour, and admits that he was not thinking of the boys, and that, his speedometer being out of order, he merely guessed at the figure given by him. We are therefore of opinion that the guesses of the others are likely to have been more accurate, particularly Mr. Maroney's, since he is shown to have been in the livery business for a long time, and is not unlikely to have acquired proficiency in the art of guessing the speed of vehicles. If, however, it could be conceded that the car was moving at the rate of only 5 miles an hour, it should have been stopped, according to the testimony of the experts in that line, either instantly or within a foot and a half, instead of which it ran not less than 14 feet from the time it struck the boy, whom the acting chauffeur had seen when he left the sidewalk and moved in the direction of the car, with his face turned in the other direction.

The ordinance prohibiting the operation of

cars by persons under 18 years of age is predicated upon the theory that caution and experience are the characteristics of age rather than of youth, and upon the well-founded belief that there are few occupations in which these characteristics are so essential to the public safety as the driving of motorcars through the streets of cities and towns. Those machines, when so used, are, at best, much more dangerous to the children and grown people who jump from the sidewalks than the children and grown people are to them; and it is the duty of the courts to make it plain that, in the hands of incautious and inexperienced chauffeurs, they are a constant menace to human life, and that it is not their owners or operators who have most reason to complain of the danger which surround their operation, but those who, or whose loved ones, are injured and killed by them.

[1] We conclude that the proximate cause of the accident, in this case, was the failure of the acting chauffeur, allowed by defendant to operate his car (though lacking the age qualifications required by the city ordinance for such function), to keep a proper lookout for the safety of the children whom he saw playing upon the sidewalk of the street over which he was about to drive the car, together with his negligence and violation of the ordinance in attempting to pass the children, so situated and occupied, without sounding his horn and at a prohibited rate of speed, and that there was a direct relation of cause and effect between the violations of the ordinance and the injury inflicted. Crisman v. Shreveport Belt R. Co., 110 La. 640, 34 South. 718, 62 L. R. A. 747; Navailles v. Dielmann, 124 La. 421, 50 South. 449, 134 Am. St. Rep. 508; Burvant v. Wolfe, 126 La. 787, 52 South. 1025, 29 L. R. A. (N. S.) 677; Shields v. Fairchild, 130 La. 648, 58 South. 497; Walker v. Rodriguez, 139 La. 251, 71 South. 534; Albert v. Munch, 141 La. 686, 75 South. 513, L. R. A. 1918A, 240.

Plaintiffs sued for $10,000, plus certain expenses, with interest from date of judgment, but (no doubt in view of the jurisprudence of this court in similar cases) now pray, through the brief of counsel, for a judgment for $6,000, which amount will be awarded.

It is therefore ordered that the judgment appealed from be set aside, and that there now be judgment in favor of the plaintiffs, each for one-half, and against the defendant, in the sum of $6,000, with legal interest thereon from the date upon which the judgment shall become final, and all costs.

LECHE, J., dissents.

### On Rehearing.

PROVOSTY, J.   [2-4] Upon reconsideration of this case, we have concluded that the accident resulting in the death of plaintiff's child was attributable more to the negligence of the boy than to that of the defendant, if not entirely to the negligence of the boy in running out into the street from the sidewalk in the middle of a block right in front of the automobile.   In fact, the only negligence which is positively proved against the plaintiff is in the fact that his son, who was running the automobile, was 17 years and 3 months old, instead of 18 years old, as required by the city ordinance.   The traffic policeman at the corner saw nothing wrong with the car as it passed the corner 150 or 200 feet before reaching the place of the accident, and the occupants of the car testify it was moving slowly; and it would hardly have put on speed after passing the policeman, for it was to stop at the next corner to let off one of the passengers.   The point of whether the lights were on is unimportant, as there was yet sufficient daylight for the lighting of the auto's lights not to have been as yet necessary.   The testimony leaves

doubtful whether the lights were on or not. But we are satisfied that if they had not been on, and it had been dark enough for their not being on to be a noticeable fact, the policeman at the street corner, whose business it was to notice such things, would have noticed it. The boys, according to their own evidence, were standing on the sidewalk when the plaintiff's boy joined them and at once kicked, or tagged, the Hammond boy, and then, in order to avoid the return kick or tag, which he had to expect, left the sidewalk and went into the street. He moved slowly, the Kelly boy says; but the other two boys say he ran, and one of them says it all happened just like a flash, and the probability is that the boy did run, and that, too, in the direction of the automobile, and that it did happen all in an instant. The automobile is not shown to have been closer to the curb then it should have been. So far as blowing the horn is concerned, the horns of automobiles are not required to be blown midway of blocks, nor because boys or other children are seen on the sidewalk; and after the boy had left the sidewalk, and was running towards the automobile, there was no time to be blowing horns—none sufficient, in fact, even for putting on brakes. That the young chauffeur was experienced and strong, and that he did all that an older man could have done to avoid the accident after the danger had manifested itself, the evidence leaves no doubt. The experts admit that, when it comes to stopping an automobile within a given number of feet, it makes quite a difference whether the stop is being made by way of testing the possibilities in that regard, or is being made in an unexpected emergency. The negligence resulting from the violation of the ordinance fixing the age of chauffeurs could serve as a ground of action only in the absence of contributory negligence on the part of the boy, or only if, after this contributory negligence had ceased, there had been a last clear chance of avoiding the accident, and under the circumstances there was no such chance. The foregoing was the appreciation of the facts by the learned trial judge; the case having been tried without a jury.

Judgment affirmed.

MONROE, C. J., and O'NIELL, J., dissent.