LINK et al. v. SHREVEPORT RYS. CO. et al.*
No. 4695.

Court of Appeal of Louisiana. Second Circuit.

March 2, 1934.

Bryan E. Bush and Foster, Hall, Barret & Smith, all of Shreveport, for appellants.

Wise, Randolph, Rendall & Freyer and A. M. Pyburn, all of Shreveport, for appellees.

TALIAFERRO, Judge.

The four minor children of Mrs. W. H. Eubank, deceased, to wit, William H., Mabel, Emma Nell and Elizabeth, through their tutor, B. S. Link, instituted this suit against the Shreveport Railways Company and the city of Shreveport to recover damages for pain, suffering, and mental agony experienced by their mother before her death, for medical expenses during her last illness, and for damages sustained by them in the way of loss of support, companionship, affection, etc., of their said mother; said damages, it is alleged, being caused by and resulting from the negligence of defendants, specifically set up in the petition.

Mrs. Eubank and her husband and five children lived at New Boston, Tex., 110 miles from the city of Shreveport. On February 6, 1930, Mr. Eubank met a tragic death, and the widow, being of limited financial substance, began to direct her attention and energies toward plans to support and educate the children. Her brother, Dr. Cather, of Oakdale, La., owned a 10-room residence in Cedar Grove in the southern section of the city of Shreveport, and this was offered to her as a future home.

Early in the morning of February 15, 1930, Mrs. Eubank and her said four minor children accompanied by Mrs. Dr. Cather and Mrs. Eubank's married daughter, Mrs. Mary Bain, in Mrs. Eubank's two-door Ford car,

left New Boston for Shreveport to inspect Dr. Cather's house in Cedar Grove. The car was driven by the son, William H., then 18 years old. Arriving in Shreveport about noon, they drove down to Cedar Grove by way of Fairfield avenue, and, after looking over the Cather house and driving about Cedar Grove some, they began the trip back toward the city by way of Tulsa street, some two blocks west of Fairfield avenue. At this time, in addition to William H., the driver, Mrs. Eubank and one of the younger girls occupied the front seat of the car; the daughter being in the middle. The party traveled up Tulsa to Vinton street, and turned east thereon with the view of again getting on Fairfield avenue. Vinton street runs east and west, while Tulsa and Fairfield run north and south. Southern avenue, which is midway between Tulsa and Fairfield, also runs north and south. It is serviced by a single-line of street railway, which is crossed at right angles by Vinton street. When the Eubank car attempted to cross the intersection of Vinton street and Southern avenue, it ran into, and collided with, a north-bound street car. This was about 4:30 p. m. Mrs. Eubank was the only person even painfully injured from the collision. She was thrown violently against the dash and windshield of the car, and received a cut in her forehead, over the left eye, about 2 inches long. She was taken promptly to a nearby home, and, after some two hours' delay in securing ambulance service, was taken to a local sanitarium, where the wound was sutured, and there she remained until the following evening. She and party occupied rooms in a Shreveport hotel the night after she was discharged from the sanitarium, and drove back to their home the following morning. Her condition was thought to be satisfactory until February 24th, at which time she showed nervousness, followed by hallucinations, being obsessed with the fear that her room was being entered by a man bent on doing her bodily harm. Her condition grew worse. She was violent to the degree that she was uncontrollable. She was taken to Dr. Cather, at Oakdale, where she stayed for a few weeks, but, as her condition grew worse, she was then placed in the asylum for the insane at Pineville, La., where she died of manic exhaustion on April 23, 1930.

Plaintiffs allege that Vinton street at the time of, and for several years prior to, the said accident, at its intersection with Southern avenue and for two blocks west of same, was a street or thoroughfare of the city of Shreveport, open to travel by the public as such; that the Shreveport Railways Company is a common carrier, operating railway lines by electric power for commercial transportation of passengers, and, as part of its business, laid and constructed the track on Southern avenue where it crosses Vinton street many years prior to said accident; that the city of Shreveport constructed the roadway on Vinton street, adjacent to the said railway track, and it and the railway company constructed the intersection of the said street and the roadbed of the railway track at that point. They further allege:

"Petitioner further shows that on February 15, 1930, and for several years before that date, the crossing of Vinton Street and the track of the defendant Railways Company was concealed and dangerous to the operators of automobiles who approached by driving easterly along Vinton Street to the crossing, for the following reasons:

"1. Embankments on each side of Vinton Street obscure the view.

"2. Trees, a house, a fence, a hedge, and other shrubs, on the south side of Vinton Street, obscure the view of street cars approaching from the south.

"3. The track of the Shreveport Railways Company was laid out and placed in a small ditch, or 'U'-shaped depression, said track being lower than the roadbed of Vinton Street on either side of the track; and that the track is thus completely concealed from a driver approaching along Vinton Street from the west until he has approached within a few feet of the track.

"4. The rails of the street railway track are imbedded and concealed in the gravel of the roadway.

"5. There was no sign, warning, marker, signal or notice of any description to indicate that there was a street railway line crossing Vinton Street at that point."

And, further, they say that the obstacles, hazards, and conditions above set forth existed at the time of the accident in which Mrs. Eubank was fatally injured, and so existed for many years before that time; that Vinton street approaches the railway track from the west on a slight downgrade; that the movements of an automobile approaching the said track, from the west, are further hampered by the presence of ditches on each side of the street, and by the presence of a wire supporting pole near the edge of the roadway and near said track; that all of said hazards to traffic at or near said intersection were created, and were allowed to

exist, by defendants, and of all of which they each had knowledge prior to the accident, and for that reason had ample time and opportunity to have remedied and repaired said concealments, dangers, and hazards to traffic; that they wrongfully, negligently, and unlawfully failed to repair, or cause to be repaired, said defects, concealments, and dangers, and negligently failed to erect signs or markers there to warn the public of the crossing.

It is further alleged that Mrs. Eubank was riding as a passenger in her own automobile when injured; that the driver thereof was unacquainted with the route over which he was· driving said car, and did not know of the presence of said railway track on Vinton street, and could not discover same until his car was within a very short distance thereof; that he was proceeding at a cautious rate of speed, and that, immediately upon discovering that he was about to cross the railway track, looked to his left and then to his right, and thereupon observed that defendant's railway car was bearing down upon him, approaching the intersection from the south at a high rate of speed; that, when he discovered the approach of said street car, the automobile was closer to the crossing than was the street car, and said driver, because of this close proximity to the track, could not bring the automobile to a stop before reaching the track; and, by reason of the fact that the speed of the street car was more than twice as great as that of the automobile, the driver of the automobile could not cross and clear the track before the arrival of the street car; that the said driver was unable to turn to his left, or north, because of a ditch and electric light wire pole, and therefore, to prevent being hit broadside by the street car, instinctively turned the automobile to the right, or south, which violently collided with the car.

It is additionally alleged· that the motorman in charge of operating said car was well acquainted with the intersection at which the collision took place, knew all the dangerous surroundings thereof, and that he negligently and wrongfully operated said street car without regard to the dangers of the crossing in the following respects:

"That he operated said street car into said crossing at a speed in excess of 25 miles per hour, and at a speed greater than that allowed by Ordinance No. 207 of 1923 of the City of Shreveport, as amended, which provides a maximum speed of 15 miles per·hour for street cars.

"That he failed to give any signal, bell, whistle, or signal of his approach until within less than six feet of the place where the collision occurred.

"That he failed to keep a lookout, or to watch for vehicles approaching the crossing from the west.

"That, knowing the dangers of the crossing he was approaching, he failed to decrease his speed in time to avoid the accident."

Plaintiffs further allege and contend that their mother's suffering, insanity, and deplorable death were due directly to the injuries received by her in said accident, specifically averring that her brain and meninges were therein injured, developing and precipitating acute mania, and, finally, death from maniacal exhaustion.

In an amended petition it is alleged that Mrs. Eubank, while riding in said automobile, was not driving same, and "had no part in the control, management, direction or operation" thereof.

The city of Shreveport filed an exception of no cause of action and no right of action, which was overruled. It is not urged here.

The railways company admitted its character as a common carrier; that it constructed the track on Southern avenue at Vinton street; and that the car which collided with the Eubank automobile was owned by it and was being operated by its employees. It further avers that the city constructed Vinton street adjacent to said track, and that it and the city constructed the intersection as alleged; that its motorman was familiar with the physical conditions and surroundings in and about said intersection. In all other respects the material allegations of plaintiffs' petition are denied. It specifically denies any negligence on its part in connection with said accident, but avers that the proximate cause thereof was the negligence of the deceased and her minor son, under her direction and control, driving her car, as they approached said crossing, at a speed in excess of 25 miles an hour in violation of Ordinance No. 207 of 1923 of the city of Shreveport, which provides a maximum speed of 18 miles per hour; in not keeping a proper lookout for intersections and crossings such as where said accident happened; in driving at such a speed and in failing to keep such a lookout as prevented them from knowing that a street car crossing was being approached; in failing to observe necessary precautions to ascertain the approach of the street car before attempting to go upon the crossing; in failing to see the approaching car and heed the warnings and alarms given; and in

going on the crossing when the street car was in such close proximity thereto as to make it impossible for the motorman in charge thereof to avoid a collision—all of which negligence bars recovery of plaintiffs.

In the alternative, this defendant pleads the above-recited acts of negligence as contributing efficiently to the accident, and, being the proximate cause thereof, plaintiffs are therefore barred from recovery herein.

The answer of the city of Shreveport is virtually the same as that of its codefendant. The same alternative plea of contributory negligence is urged.

William H. Eubank reached majority before the case was tried, and thereafter made himself a party to the suit in his own right.

At the instance of plaintiffs, the case was tried with a jury, who rendered a verdict in favor of defendants. From the judgment of the court rendered pursuant to the jury's verdict, plaintiffs have appealed.

Motion for New Trial.

Plaintiffs timely filed motion for a new trial on the following grounds: (1) That the verdict was illegal and contrary to the law and evidence; (2) that, when the case was called for trial, plaintiffs attempted to challenge for cause all veniremen on the jury panel who were taxpayers of the city of Shreveport; and said challenges were disallowed by the court; that an unusually large number of taxpayers of the city of Shreveport were on the venire for May, 1933, eighteen in all, and movers were obviously unable to protect their rights by means of unused peremptory challenges allowed by law; that, of the twelve jurors who tried the case, eight of them were taxpayers of said city, of whom seven voted in favor of a verdict for defendants; that said verdict, rendered by a jury composed of eight taxpayers of the city of Shreveport and four nontaxpayers thereof, is illegal, erroneous, and contrary to the law; (3) that the court erred in excluding testimony tendered by plaintiffs to prove that special instructions were given by the superintendent of the Shreveport Railways to the motormen of its street cars who passed the scene of the accident at the hour when the jury had been ordered by the court to visit and observe the scene.

On May 22d, while the original motion for new trial was pending, plaintiffs filed a supplemental motion for new trial on the ground that two members of the jury who voted for the verdict herein did, during the trial of the case, and before verdict, without authority of the court, conduct experiments at the scene of the accident, using their own automobiles and the brakes thereof, in an effort to acquire evidence as to the speed of the automobile of plaintiffs involved in said accident; that said jurors, though acting under good motives, thereby received as evidence matters not properly produced before them, and which were not subject to cross-examination or rebuttal.

The lower court did not think any of the reasons urged for new trial good, declined to hear testimony in support of the motions, and, for written reasons, overruled them.

So far as the second point urged for new trial is concerned, viz., ineligibility of certain jurors to try the case because they were taxpayers of the city of Shreveport, one of the defendants, the issue raised thereby is properly presented in the record, and it was not necessary to urge same in motion for new trial. Plaintiffs challenged the jurors for cause. The challenges were overruled and bills of exception duly reserved. We think the law is clear that the ruling of the trial judge on the challenges submitted by plaintiffs is correct. By an Act of January 9, 1825 (Laws 1824–25, p. 24) the Legislature of the state provided that it shall not be sufficient cause to challenge jurors called to serve in any civil or criminal case to allege that they are citizens or inhabitants of the state or of the parish or members of the politic or religious corporation who may be a party to the cause, or that they pay any state, parish, or city tax. This act was revised in some minor respects and re-enacted by Act No. 275 of 1855. It was adopted in full, as revised, by the Revised Statutes of 1870, and appears as section 3190 of that body of laws.

Article 507 of the Code of Practice of 1824 provided that:

"A juryman may be challenged as suspected of partiality in the case: * * *

"2. If he have an interest, direct or indirect, in the cause."

And the Supreme Court, in Mayor, etc., of City of New Orleans v. Ripley, 2 La. 344, held that there was conflict between the Act of 1825 and this article of the Code of Practice, but that, as the act was the later expression of the legislative will, it prevailed over the Code. Learned counsel, therefore, argue that, in view of this decision of the court and of the declaration in section 3990 of the Revised Statutes of 1870, in case of conflict between its provisions and those of the Code of Practice, the latter should prevail, that the test of competency of a juror in a civil case is only

to be found in article 507 of the Code of Practice, and that interest, direct or indirect in the cause, renders a juror wholly unqualified to serve in such cause. It is further argued that, as Act No. 203 of 1918, amending article 338 of the Code of Practice, as amended by Act No. 35 of 1882, by its own title only applies to recusation of judges, the provision thereof relative to challenging jurors for cause on the ground that they are citizens or inhabitants of a political subdivision party to the suit, or pay taxes to same, are ineffective because the act thereby is made broader than the title.

We think section 3190 of the Revised Statutes is still the ruling law on this question. The 1825 act, as held by the court in Mayor, etc., of City of New Orleans v. Ripley, 2 La. 344, superseded article 507 of the then Code of Practice, on the question of qualification of a juror in a civil case, if there were real conflict between the two, and the fact that the provisions of the 1825 act have been carried into the Revised Statutes of 1870 does not affect the legal situation as it was shaped by the passage of the 1825 law. If that law repealed the provision of the Code of Practice on the question, or, more strictly speaking, modified it in the respect mentioned, that effect or modification was not changed by the adoption of the Revised Statutes. If the 1825 act repealed article 507 of the Code of Practice then existing, even though it (1825 act) had been later repealed, that fact would not have revived the codal provision. Civ. Code, art. 23.

In regard to the third cause urged for new trial, we think the lower court correctly took care of the question raised thereby in its instructions to the jury. Substantially, the jury was charged that, in determining the question of liability, they must consider only the facts as they existed at the time of the accident as disclosed by the evidence; that the speed of the automobile and the street car involved in the collision and their manner of approaching the intersection, as well as the ringing of bell and sounding of gong, etc., were to be likewise determined from such evidence; that the manner in which a street car, other than the one involved in the accident, approached and entered the intersection, should not be considered by them; that only the automobile and street car involved in the collision should concern them in arriving at a verdict in the case. The charge was quite full on the question, and the jury was enlightened thereby as to its duty concerning the facts.

On the point raised in supplemental motion for new trial, the lower court, in reasons for overruling the motion, says:

"On this score it is alleged that two members of the jury, during the course of the trial, conducted experiments at the scene of the accident, using their own automobiles, and the brakes thereof, in an effort to acquire evidence as to the speed of the automobile involved in this case and thereby received as evidence matters not properly produced before them and which was not subjected to cross-examination or rebuttal.

"In support of this is cited Corpus Juris, Vol. 46, page 144, to the effect:

" 'In an action for personal injuries sustained by the alleged negligence of defendant in operating a motor vehicle on a street, where some of the jurors voluntarily visited the locus of the accident and made experiments on the ground with an automobile, a new trial was granted to defendant. * * *' Citing authorities, the main one being some report unfamiliar to us and not accessible.

"The same work, Corpus Juris, same paragraph, adds the following:

" ' * * * but was refused where such misconduct was without prejudice.' Citing authorities. This has been applied, as a general proposition, in this state in many criminal cases.

"In the present case, even granting that the two jurors did what is alleged, could any prejudice have resulted? If it is impossible to tell, then prejudice must be presumed.

"The plaintiff put on no specific evidence as to how far it would take to stop that model automobile at that particular place at different speeds. The defendant conducted an experiment with the same model automobile, at the same place, carrying a similar load; and the results were testified to by several witnesses.

"The conclusion to be drawn from such testimony could only be that the automobile involved in the collision was going much faster than the occupants said it was; just how much faster the experiment could not show.

"This testimony as to the experiment was uncontradicted, and being so, the jury necessarily had to accept it as a proven fact.

"As the experiment testified to did not, and could not, show the actual speed of the automobile involved in the accident, then neither could the alleged experiments of the jurors. It could only have either contradicted the experiment testified to (which would be in

plaintiffs favor) or corroborated it. This could not have hurt plaintiff for the jury had to accept the testimony given in court, it being uncontradicted.

"We do not see how the alleged experiments by the jurors could possibly have prejudiced plaintiff. The situation might be different if plaintiffs had offered any testimony tending to contradict that given by defendant."

In this state, consideration of questions of fact, as well as of law, is the prerogative of appellate courts. The right of trial by jury in a civil case is not accorded unless specially prayed for, and then, on appeal, the jury's decision on fact and law may be reversed. Errors of procedure and faulty rulings of the trial judge may be corrected on appeal without ordering a new trial. Therefore, even though a jury be illegally constituted or have as its members some who are disqualified, these irregularities are entirely eliminated or absorbed by the appellate court in passing on the merits of the case.

We quote the following from the syllabus in Schwing v. Dunlap, 130 La. 498, 58 Só. 162, 163, which is in line with the above reasoning: "As this court is vested with jurisdiction of the facts in a civil case, tried in the first instance by a jury, and is provided with a transcript containing the pleadings and evidence upon which the jury acted, with power to give such judgment as the evidence may warrant, it will not, readily, reverse a verdict and judgment, on the ground of alleged error in the ruling of the trial court upon the question of the impartiality, vel non, of a particular juror."

Also Driefus v. Levy (La. App.) 140 So. 259, is in point.

This ruling has special application to the issue raised by plaintiffs' amended motion for new trial and to No. 3 of the original motion.

In this court plaintiffs have filed an alternative motion to remand the case should we not reverse the judgment, setting up therein all the grounds covered by their motions for new trial in the lower court. We agree with the lower court in denying new trial, and, for the reasons herein given, deny the motion to remand.

### The Merits.

In brief, plaintiffs' counsel state that their suit is founded upon two items of negligence on the part of defendant: (1) The concealed and dangerous condition of the crossing, which had existed for several years; (2) the negligent operation of the street car by the motorman.

The primary defenses urged by defendants are: (1) Lack of any negligence on their part; (2) that Mrs. Eubank's insanity and associated pain and physical and mental suffering, culminating in her death, had no causal connection with, nor was it traceable to, the results and effects of the accidental collision; and (3) that the accident was caused solely by and through the negligence and lack of care of the driver of the automobile, William H. Eubank, and Mrs. Eubank, mother of plaintiffs.

If it is established that there was no actionable negligence on the part of either defendant, plaintiffs' case falls. No useful purpose would then be served by extending our labor to a determination of the issue as to whether the accident caused or contributed to the suffering, insanity, and death of Mrs. Eubank.

The result will be the same should we find and hold that defendants, or either of them, were negligent in regard to the crossing conditions, etc., but that such negligence was not the proximate cause of the collision, but that such proximate cause was the contributory negligence of deceased and her son, William H. Eubank.

When this accident occurred, there was a frame cottage at the southwest corner of the intersection of Southern avenue and Vinton street. It sat back south of Vinton street possibly 30 feet, and about the same distance west of the avenue. A walk led to the west front of the building from Vinton street, on both sides of which evergreen shrubbery grew, which, at the time of the collision, had been recently trimmed to a height of not more than 3 feet. The general level of the surface of that part of the lot on which this residence was located, adjacent to said streets, and in the angle formed by their intersection, was not more than 4 feet higher than the gravel surfacing of Vinton street. The street car involved in this collision was about 40 feet in length and 12 feet high. The rails of the car track in the intersection are 1.4 feet below the surface of what would be Vinton street, if there were no break in its continuity across the avenue. Therefore, as the street car approached the intersection, there were some 4 feet of its entire length, above all obstructions, visible to a person on Vinton street, near the intersection. In addition, there was an unobstructed space of several feet between the building and the southern end of the shrubbery, and likewise several feet clearance between the northern end of the shrubbery and Vinton street. The testi-

monial proof and photographs of this locus make it quite clear that, at the time of the accident, as far as 90 feet on Vinton street, west of the crossing, any one keeping a lookout for traffic from the south should observe a street car approaching the intersection when it is as much as 125 feet therefrom, and that thereafter nothing was in the way to prevent such person from constantly seeing the car as it traveled toward the intersection.

Southern avenue, for some distance above and below Vinton street, is not open to vehicular traffic; nor, as we think, has it ever been. That vicinity is sparsely populated. The railway line, north and south of the intersection, is laid in a cut through the land, a hilly section of the country, ranging from 4 feet and more in depth. The four property corners created by the crossing are all several feet higher than is the railway track or Vinton street. There were residences on each corner lot when this collision occurred. There is a rise in elevation of Vinton street from the west line of Southern avenue to a point 150 feet west, of 1.5 feet, and thereafter, going west, the grade declines at about the same rate as it inclines to that point from the avenue. The testimony supports the contention that a motorist on Vinton street, driving toward Southern avenue, may see the rails of the street car line when 150 feet distant therefrom. The topography of the locus was sufficient to attract the attention of an alert driver and others charged with responsibility of prudent operation of a car, and to instantly impress them with the intelligence that they were about to enter an intersection, or cross the path of vehicular or other traffic.

Mrs. Bain says the automobile was only 15 feet from the track when she first observed the street car, and that the car was almost at the intersection. Mrs. Cather states that the automobile was within 25 or 30 feet of the track when she first saw the car, while the driver, young Eubank, testified that he only discovered the track in front of him an instant before he saw the street car; that he was then 20 or 22 feet from the track; that he could not turn to his left because of a large electric wire pole at the corner; to try to cross over ahead of the car would probably result in the automobile being hit broadside by the car, and he therefore turned the automobile slightly to his right in the hope of hitting the car a glancing blow; that he was approaching the track at the rate of from 12 to 15 miles per hour, and applied his brakes as soon as he observed the moving car. He says he only saw the car as it "came from around this embankment and

hedge and fence." He states that the street car was traveling at the rate of 30 or 35 miles per hour. His estimate of his own rate of speed and that of the car was corroborated by other occupants of the automobile. He did not hear the street car whistle nor the sound of its gong before seeing it. The testimony of his sisters and Mrs. Cather is to the same effect. The automobile struck the car at an angle with considerable force. All of its occupants were thrown forward. The front end of the automobile was mashed in; the damage was considerable. Passengers on the car were jarred by the force of the impact.

The testimony of the motorman and conductor on the street car, corroborated by the evidence of several, if not all, of the passengers thereon at the time, none of whom has any interest in the outcome of this suit, establishes that, in keeping with company rules and custom, the whistle of the street car blew when 100 or 125 feet of the intersection, and again when 50 feet therefrom, and that the gong sounded continuously for an appreciable length of time before the car entered the intersection. This same evidence also proves that the street car was moving at the rate of about 20 miles per hour when the first whistle blew, that as it approached the intersection its speed was gradually reduced, and as it entered the intersection it was going at the rate of from 7 to 10 miles per hour. These same witnesses, or several of them, also testified that the Eubank car, as it came down grade toward the intersection, was traveling from three to five times as fast as the street car. The fact that the street car was stopped within its own length, blocking the intersection after the impact, is confirmatory of the contention that it was moving slowly when struck by the automobile, and, applying the rule of cause and effect, it appears reasonably certain that the automobile was moving at a rate far in excess of 15 miles per hour when the collision occurred. If the automobile was going at the rate of 12 miles per hour, with effective brakes, it could have been stopped within 9 feet; if going at 15 miles per hour, it could have been stopped within 12 feet. These facts are established by actual tests, and, while we know that the making of such tests deliberately is quite different from stopping a moving automobile by application of the brakes in the face of an unexpected emergency (Elmendorf v. Clark, 143 La. 981, 79 So. 557, L. R. A. 1918F, 802), yet, had the Eubank car been moving at the rate its driver testified, it ought to have been stopped

within 20 or 22 feet, or its momentum so materially reduced that the impact with the car would have been slight.

■ Young Eubank and the other occupants of the car had never motored before in the city of Shreveport. They were unacquainted with the place where the collision occurred. They were endeavoring to return to Fairfield avenue, and say they were eagerly keeping a lookout for that thoroughfare. Being absorbed in the desire to relocate Fairfield avenue, we are unable to understand why they did not observe the conditions at the intersection in time to avoid risking a collision there. The evening was drawing to a close. They wished to return home that night. We are convinced that for these reasons, coupled with the fact that they were moving on a down grade, the car was traveling at a rate much greater than its occupants now think it was. The testimony preponderates decisively in favor of this conclusion. It is our opinion that the car was going much faster than 18 miles per hour, in violation of a city ordinance, and that this fact contributed to the accident as a proximate cause thereof.

■ In regard to the charges of active negligence against defendants, we do not find that such has been established by the evidence in the case. The railway was constructed in the manner authorized by the authority which granted the company the right to build it. The improvements, fences, etc., on the lot at the southwest corner of the intersection were erected by the owner thereof, over whom defendants had no control; and certainly they could not force the owner to lower the lot level for the benefit of persons traveling Vinton street easterly. In such circumstances the railways company could not be charged with negligence unless its failure to post signs warning of the presence of the tracks there be such negligence. It would have been an act of prudence to have done so, as it did after the accident, but there is no specific law that imposed this duty upon it; and, as we have found that the crossing was not completely concealed, but, on the contrary, it and the track could be seen at a distance of 150 feet by one motoring from the west, the absence of warning signs was not actionable negligence, if negligence at all. The testimony shows beyond any doubt that those in charge of the street car were not negligent in its operation as the intersection was approached, but, on the contrary, followed the regular custom of blowing the whistle and sounding the gong in such

manner that the noise therefrom was heard by all the passengers on the car, by some of the people living near the intersection, and there is respectable evidence to the effect that another car coming from the west, in deference to these signals, was stopped by its operator ahead of the Eubank car and within a short distance of the tracks. It should have been heard by the occupants of the Eubank car.

■ Plaintiffs' counsel argue that, should it be found and held by us that the negligence of William Eubank was the proximate cause of the collision, and that thereby he is barred from recovery as an heir of his mother, such negligence cannot be imputed to the mother because she, while riding in the car operated by her son, had no part in the "control, management, direction and operation thereof." As a general rule, the legal proposition advanced by counsel is sound, but in this case we have experienced no difficulty in reaching the conclusion that the negligence of the driver is imputable to his mother, and, for that reason, none of the plaintiffs can recover. The automobile, driven by the son, was owned by the Eubank family. The trip down to inspect the Cather home in Cedar Grove, and the environment, was discussed by the family after the father's death. Mrs. Cather testified that Mrs. Eubank was steering the party, and William Eubank testified that his mother decided upon making the trip and knew the address of the property; that she wanted to ascertain if it was adequate to accommodate the family and, in addition, some roomers and boarders she wanted to take in. He further stated that his mother suggested that on the return trip to Shreveport they follow a different route from that which carried them to Cedar Grove, as she wished to look over the neighborhood some, and that is the reason the party was on Vinton street at the time of the accident. In all respects, the record leaves no doubt that this unfortunate mother was directing this party from its beginning until the accident happened. Her son, the driver, was subject to, and controlled by, her orders and suggestions. Out of motherly solicitude, she was endeavoring to find a suitable place to establish a new home for her children. She could not operate an automobile, and naturally intrusted this part of the journey to her minor boy, who, it appears, did nearly all the family driving after the father's death. She was legally responsible to others for any actionable negligence on his part, both under the law of agency and as his parent, and, since the evidence and circumstances of the case es-

tablish the relations between them as principal and agent, his negligence was her negligence.

In addition to this, we think there was negligence of an independent character on the part of Mrs. Eubank. She was of a mature age and experience. The boy possessed neither. They were driving in a thinly inhabitated part of the city where surface conditions and hazards to traffic were wholly unknown to any of them. The circumstances demanded that the greatest degree of care and caution should have been employed for the safety of all members of the party. The mother should have been the first to see that the driver pursued such a course, and, beyond this, she, being on the front seat with him, should have been as alert as he in keeping a close watch on the road ahead of them. Evidently she did not do this.

In Leopold v. Texas & Pacific Ry. Co., 144 La. 1000, 81 So. 602, the court rejected the demand for damages by the father who, while riding in a car operated by his son, was injured from a collision with defendant's train. The syllabus of that case reflects the rule laid down by the court therein: "Where physician riding in his automobile driven by his son when approaching obstructed railroad crossing in bad condition watched son, whom he was afraid could not handle the car properly, instead of looking for approach of a train, though he knew it was about train time, so that automobile was struck before it cleared the tracks, doctor and his son are barred from recovery by their active negligence, doctrine of last clear chance having no application.".

There are many cases in our jurisprudence wherein this doctrine is involved, and in all of them, so far as we have found, it is held that negligence of the driver may not be imputed to the guest unless "the circumstances were such that he could be charged with independent negligence on his own part."

The rule is discussed extensively in Williams v. Lenfant, 15 La. App. 515, 131 So. 857, and therein much of the jurisprudence bearing upon it is reviewed and text-writers quoted from. The rule is tersely laid down in R. C. L. 20, p. 159, as follows: " * * * Of course the occupant of a vehicle will not be permitted to recover where it appears that he himself was negligent either in permitting the driver to encounter known dangers, or in failing to use his senses of sight and hearing to discover the perils of the highway."

And to the same effect is Corpus Juris, vol. 45, p. 1016.

In such circumstances, recovery is denied a plaintiff, not because of the driver's negligence being imputed to him, but because of his own independent negligence.

To the same effect is the holding in: Toups v. Morgan's L. & T. R. & S. Co., 4 La. App. 136; Roberts v. Eason, 6 La. App. 703; McQuiston v. Shreveport Rys. Co., 12 La. App. 277, 124 So. 706.

In Bofill v. New Orleans Ry. & Light Company, 135 La. 996, 66 So. 339, L. R. A. 1915C, 419, it was held (quoting syllabus) that: "Where a person is riding in a vehicle, driven by another, but of which, and of the driver of which, he has entire control, the negligence and inexperience of the driver are imputable to him."

The trial of this case consumed 8 days. An intelligent jury heard the evidence, and, during progress of trial, inspected the place where the accident occurred. By a vote of nine to three, plaintiffs' demands were rejected.

We agree with this verdict, and the judgment rendered thereon is affirmed, with costs.

MILLS, J., recused.