MONROE, C. J.
Plaintiffs sue for $40,064, as damages, for injury to, and death of, their minor child, William Howard Cannon, 5 years and 9 months of age, who was killed on March 15, 1917, by an electric street car, owned and operated by 'defendant. They allege negligence, in the nonuse upon the car of a fender and other modern appliances and equipment, in the employment of an incompetent motorman, and in his failure to see the boy in time to have avoided the accident. Defendant denies the charge of negligence, alleges that the killing was the result of an accident, which, so far as it was concerned, was unavoidable, and pleads contributory negligence on the part of the child and its parents. The case was tried before a jury, which found a verdict for plaintiffs in the sum of $564, and from the judgment based thereon plaintiffs have appealed. Defendant has answered the appeal, praying that the judgment be reversed and the suit dismissed. The facts as disclosed by the evidence are as follows: Plaintiffs’ residence is on the west side (near the new Park, in Alexandria) of Lee street, which appears, at one time, to have been known as the Bayou Robert Road, and which, approaching from the south, forms a junction with Bringhurst street, coming in from the east, Lee street, coming from the northeast, and Bolton avenue, coming from the northwest, and it is as much a continuation of Bolton avenue as of Lee street, from which it, perhang, takes its present name. It and Bolton avenue are occupied, longitudinally through their centers, by a single-track railroad, owned by defendant and upon which it operates electric motorcars that reach the neighborhood of plaintiffs’ residence, far out in one direction, and pass the .public school, which stands on Bolton avenue at a distance of, say, 1,500 feet from its junction with the streets mentioned, in the other direction.
Plaintiffs had six children ordinarily attending the school, though there were only five who attended on March 15, 1917. The little boy, Howard, who was killed, was the youngest, and the next in age was Burton, who had passed his eighth year, but Howard was stronger, larger, and more active than Burton, and, as we infer, did not subject himself to Burton’s control. In going to school, the younger were shepherded by the older children, but the former were allowed to return (in fact, sent) home at 12 o’clock, whilst .the latter were kept later, and, upon those occasions, they (the younger ones) were expected to take care of themselves, and were instructed to cross Bolton avenue at the schoolhouse, after which, they had only to proceed upon the same side of the avenue, and its continuation (Lee street) in order to reach home. On the day mentioned, they left the school at the usual hour, and it seems likely that they then crossed the avenue, to the west side, according to their instructions, and proceeded on that side until they reached the street junction, but at that point, in disregard of their instructions, they recrossed to the east side of Lee street, and, their attention having been called to a delivery truck drawn by two mules, moving at a trot in the direction in which they were going, they set out to catch on behind, which Howard succeeded in doing. Burton, however, was not successful in catching the truck, *291 and withdrew to the east side banquette, whence he had started, and trotted along, though falling behind, until, when the accident occurred, he was 100 or 150 feet from the truck. The truck had a seat in front some 3 feet high, for the driver, which was boxed underneath, had stanchions along the sides, and something at the rear end which the driver says was used as a skid, to aid in loading and unloading the truck, but he does not describe it or state its position, and it is not clear what the little boy was hanging to; the impression that we get being that it was the floor at the tail of the wagon, and that the skid may have been in front of him. One of the witnesses seemed to think that he was at times running and at other times resting his feet on the rear axle tree, but the driver did not think that could have been done. In any event, the driver did not, at any time, see him, nor did the motorman of defendant’s car, which approached from the other direction, until, when the car and wagon were actually passing each other and the forward step of the car was about abreast of the doubletree to which the mules were attached, the boy let go his hold upon the wagon, which was only 4 or 4% feet from the car, and ran directly in front of the car, moving at the rate of 10 miles an hour, within a distance, as we think, of about 4 feet, where, notwithstanding the utmost that the motorman could do, which was all that any one could have done, he was knocked down and killed, the whole movement occupying, probably, less than two seconds.
There were but three persons called who, as eyewitnesses, were able to give any account of the accident. Two of them, Anderson and Johnson, were called by plaintiffs, and the third, the motorman, by defendant. Anderson was walking on the banquette in the direction in which the car was moving, and saw the whole of it. Johnson was on his front gallery immediately opposite the scene and about as well situated for seeing what happened as Anderson. Anderson thought that the distance between the car and the boy when the boy got on the track might have been 6 feet. Johnson doubted whether it was as much as 4 feet. They agreed that nothing, so far as their knowledge extended, could have been done by a driver (Anderson being a teamster), and that nothing could have been done by the motorman, that could have prevented the thing that occurred. The motoi*man’s testimony is to the same effect. He saw the boy as he jumped from behind the truck (4 or 4% feet distant from the track and moving in a direction opposite to that in which the car was moving) and he says that the car was about 4 feet from the boy when the latter reached the track. The car, it will be remembered, was eating up the distance at the rate of more than 14 feet a second, so that it required less than a third of a second to reach the boy; and, to which add 1% seconds as the time required for the boy to cover (running) the 4 or 4ys feet from the truck to the track, and in that time the motorman threw off the controller of his car, reversed the lever, and made a turn, or half turn, with the brake. If there had been time, he would have turned on the current again, but it would have done no good, the car had passed over the boy, and his soul had gone to a better world.
Two or three persons who had been motormen, called by plaintiffs as experts, gave testimony upon the subject of the possibility of stopping cars under given circumstances, and the court, on motion of defendant’s counsel, but over the objection of plaintiffs’ counsel, named two of them, with the motorman of the accident, to test their theories, by a practical experiment in the presence of the litigants, their counsel, the court and jury, with the same car, in the same condition, at the same speed, and using the same motive and stopping power, on the same track and *293 at the same place, and on a day of the same kind, and the test was made, with the result that the best stop that was effected was within 62 feet after the giving of the stop signal. We attach no importance to that result, as the counsel for plaintiffs declined to participate in the test and attended merely as onlookers, and because without it the evidence satisfies us that no power yet discovered could have been so applied, to the 12,000 pound car in question, moving at the rate of 10 miles an hour, within the time that elapsed from the moment that the boy ran from behind the truck, and that at which he was run over by the car, as to have prevented that deplorable tragedy. We find no just ground of complaint in either the general qualifications of the motorman or his conduct on the particular occasion here in question. It appears to us that he did all that any one could have done or could have been expected to do, and that he was in no wise to blame for the accident.
The car and its equipment were also shown to be in a satisfactory condition, save in the matter of the absence of a fender. Act 116 of 1912 requires street railroad companies to provide their cars with fenders, under penalty of fine and imprisonment, and it appears that defendant complied with that requirement for a year or more after the statute was enacted, by providing its cars with fenders of a particular pattern, which were, perhaps, at the time, the best in the market, but that it soon gave them up as impracticable and useless. Since, then, however, other fenders have been patented and have come into use, which are said to be efficient, if opportunity is afforded to drop them, their “riding” position, as it is called, being somewhat elevated above the track. In this instance, we are convinced that the motorman would not have had time, effectively, to have dropped a fender, and, though negligence is no doubt imputable where there has" been a violation, or nonobservance, of law, resulting in injury, there must be some causal connection between the negligence and the injury to entitle the injured party to recover damages in a civil action, and here we find none. Perhaps the latest case upon that point, decided by this court, is that of Elmendorf v. Clark, 143 La. 971, 79 South. 557, being an action in damages, by the parents of a boy who was run over and killed by an automobile, in which it was held, the present writer and Mr. Justice O’Neill dissenting, that:
“The negligence resulting from the violation of the ordinance fixing the age of chauffeurs could serve as a ground of action only in the absence of contributory negligence on the part of the boy, or only if, after this contributory negligence had ceased, there had been a last clear chance of avoiding the accident, and under the circumstances there was no such chance.”
It is sufficient, however, for the purposes of the present case that it is here affirmatively shown that the failure of defendant to provide a fender for its car in no wise contributed to the accident, which must have happened even had the car been so provided.
The references in the exhaustive brief of the learned counsel for plaintiffs, to decisions of the federal courts, construing the “Safety Appliance Act,” appear to us to be irrelevant, since this case does not arise under that act; and the question of the effect of contributory negligence is determined by the express language of the act itself, which, however, is confined in its application to the relations between carriers, by railroad, of interstate and foreign commerce, and their employes. U. S. Comp. St. c. E, §§ 8657, 8659.
Being of opinion that plaintiffs are not entitled to recover, the judgment awarding them $564 must be set aside.
It is therefore ordered that the judgment appealed from be set aside, that plaintiffs’ demand be rejected, and that this suit be dismissed at their cost.
DAWKINS, J., takes no part. -