HARGUS v. N. O. PUBLIC SERVICE, INC.

(June 18, 1928.  Opinion and Decree.)
(July 7, 1928.  Rehearing Refused.)
(October 3, 1928.  Writ of Certiorari and
Review denied by Supreme Court.)

Howell Carter, H. W. Robinson, of New Orleans, attorneys for plaintiff, appellee.

Benjamin W. Kernan, of New Orleans, attorney for defendant, appellant.

CLAIBORNE, J. Plaintiff claims $20,000 damages for the death of his daughter eleven years, eight months and twenty days of age.

He alleged that on May 11, 1924, about noon, his daughter, in company with her twin sister, left the church at the downtown river corner of Canal and Derbigny Streets, and crossed the lower driveway of Canal Street and part of the neutral ground in the direction of uptown, that this area is a safety zone and so marked as a warning to drivers of street cars to maintain extreme care to observe in ample time persons leaving the church to avoid injuring them; that there was a number of other persons leaving the church at the same time and proceeding along the neutral ground of Canal Street, giving an additional warning to those in charge of the electric cars for increased care; that at the same time an electric car of the defendant company of the Esplanade Street line was proceeding along the upper side of the Canal Street neutral ground in the direction of the river at a high and dangerous rate of speed; that the said car ran into petitioner's said child, Iris D. Hargus, just as she stepped upon the first rail of the track; that she was caught in front and underneath the fender instead of being picked up by the fender, and was dragged for a distance of over two car lengths, approximately 75 feet, before the motorman could bring the car to a stop; that the wheels of the car went over the child's body and its right arm, leg, and side were crushed; that petitioner's child was taken to the Charity Hospital where she suffered in-

tense agony because of her awful injuries, and where she died six hours later.

The plaintiff charges the defendant with negligence in the following particulars:

1st. That it was running its cars at an excessive rate of speed.

2nd. That no warning bell or signal was sounded by the motorman.

3rd. That the motorman in charge of the car was an elderly man 65 years of age who was short sighted with failing eyes and wore glasses; and who could not distinguish persons in the vicinity or gauge distances.

4th. That the car was equipped with brakes which were old and worn and in bad condition and not sufficient to keep the car in control.

5th. That the fenders with which the car was equipped were not in compliance with law and were not effective, and could have saved the child's life if properly operated.

Plaintiff claims damages for the loss of love and society of his child and for the pain and suffering he had endured because of her early death; and for the loss of support in his old age which he could have expected from his child.

The defendant admitted that "at the time of the accident referred to in the petition there was a number of persons on Canal Street; it averred "that the injured child was taken to the Charity Hospital and that she died the same afternoon, being unconscious from the time of the injury until her death" it admitted that the street cars are required to be equipped with fenders and averred that the car concerned in the accident was equipped with fenders approved by the proper authorities.

Further answering respondent averred that it was informed that on May 11, 1924, a child suddenly ran into the front end of an Esplanade Belt car which was then being prudently operated on the neutral ground of Canal and Derbigny Streets on a trip towards the river, and was knocked down and so severely injured that she died the same day; that the plaintiff is "without right to recover damages for her injuries and death for the reason that said child was herself the cause of her injuries and death in that she failed to exercise that care required by the circumstances then and there existing and in running into the car as hereinabove set forth."

The case was tried by a jury who rendered a verdict, 11 to 1, for $12,000, affirmed by a judgment of the Court. From this judgment the defendant has appealed.

The Judge's learned charge to the Jury conveyed to them the law as we understand it to be. He charged them substantially as follows:

"The plaintiff here will recover if you find that the death of the little child was caused by the fault of the defendant, the railway company, or by any of its employees, or by any defect in the machinery or equipment employed by the defendant. It must appear that the negligence caused the damage. If you find also that the little girl, the plaintiff's daughter, was also negligent, and that her negligence contributed to the injury, in that case you cannot find for the plaintiff, because where an accident is caused by the negligence of both parties, the law gives relief to none of them. Though you find that the girl put herself in front of the car or so near to it as to be hit by it, if you find that after she got in that position the motorman saw, or could have seen her, and would have had time, by the use of appliances, to avoid the accident, then the plaintifffff should recover notwithstanding the negligence of his daughter.

"You are required to determine the facts by a preponderance of the evidence. A child eleven years of age, bright and intelligent is capable of contributory negligence. People have a right to assume that a child of that age will take care of itself."

We have enumerated the charges of negligence preferred by the plaintiff against the defendant. We will examine them in their order.

I. That the car was running at an excessive rate of speed.

G. L. Leefe, a druggist, at the time of the accident, was just coming out of the Canal Street Presbyterian Church, on the downtown river side of Canal and Derbigny Streets; there was an unusually large crowd at the church; he saw some of the congregation move towards the neutral ground; he did not see the car before the accident; his auto was parked on the uptown river side; by the time he went towards South Claiborne and returned to the church, one-half or more of the people were out of the church; he picked up his family at the church and had just started when some one hallooed: "Somebody under the car"; he picked up the child from under the wheels; he was so excited he imagined the car stopped at least two car lengths from the regular car stop; the car must have been 50 or 60 feet or not quite that much; the child was lying upon its back, the right arm and the right leg had been cut off; the child was wedged in under the forward left wheel of the rear truck; evidently the damage must have been done by the front truck; it seemed to him that the two front left wheels passed over her; some of the people who left the church were on the neutral ground waiting for cars and others were standing in front of the church; the child's head was under the car and was resting towards the west end; the car had to be reversed in order to pull the body from under the wheels; he did not see the accident.

John H. Aitken is a steam airbrake repair man; at the time of the accident he was coming out of the church; there was an unusually large attendance as it was "Mother's Day"; the church was full and it holds about 450 people; as they came out of the church they moved in all directions, to the south side of Canal Street, to the west out Canal Street, some went upon the neutral ground and waited for cars; some went off in autos and others on foot; he did not see the accident but he saw the girl's body under the rear truck wheel with her arm cut and trying to get out from under the downtown wheel; the car stopped at about 90 feet from the crossing; he ran to the front of the car and told the motorman to back down.

M. E. Lavigne is a real estate salesman. He was seven months a motorman for the N. O. Public Service; he had an accident and they wanted him to admit things that were not true, and he resigned before he was discharged; the child had just been removed to the hospital when he got to the scene of the accident, the car was about a length beyond the regular stopping place.

Mrs. Anna Coffee testified that she was between the two tracks on the neutral ground; there must have been 40 or 50 people scattered on the neutral ground, one-half children; she saw the car half a square from the corner coming towards the river; it came at a pretty high speed, and did not seem to slow down as it approached the corner of Derbigny; she did not see how the accident happened, but she saw the child under the wheel, the car was still moving very slowly

coming to a stop; the front end of the car was then 60 or 65 feet from the crossing; the child was "under the front wheel on the left hand side of the car"; she "saw the front wheel go over the body"; her feet were under the car and her head was outside; when the car was stopped the child "was lying up against the last wheel in front, not in the back, in the front, two wheels had already went over her"; the body was lying against the rear wheel of the front truck.

H. W. Rousseaux is conductor of steam railways; he was walking out Canal Street on the uptown side near about 50 feet from Derbigny; the people that he saw were between the street car downtown and the church; he saw a car coming up Canal Street a half of a block away; it was running fast, like they generally run; he did not notice that it slowed up as it neared Derbigny; after the car stopped, the front end may have been 40 or 50 or 60 feet from Derbigny Street; he got close enough to see that somebody was under the car; the car was running at its usual speed.

Ina Hargus is the twin sister of the deceased; she is 13 years of age, and was 11 on the day of the accident; when the church was over not many people crossed to the neutral ground; she and her sister crossed the street and passed the first track and stopped on the neutral ground; she looked for the street car and saw it coming fast; it did not slow up as it came to Derbigny Street; "when we stopped, she (her sister) was closer to the track than I, and the car was coming fast, and maybe the wind must have thrown her under the fender and caught her, and that was the last I saw of her, and I heard her scream under the car in the front part of it"; she saw the motorman looking at the church on the left side of the track; they were in front of the first track on the neutral ground, at the time they stopped the car was 23 feet from the lake side of Derbigny Street; they stopped to let the car go by; she was about 18 inches from the track, her sister was beside her on her left side, closer to the track; the car passed the witness first and did not strike her.

"Q. Don't you know that Iris jerked away from you and ran ahead of the car; is not that so?
"A. Yes.
"Q. Now, didn't you try to stop her and hollered to her to stop?
"A. I hollered.
"Q. And she didn't stop?
"A. No, sir.
"Q. Now, is it not true that Iris ran into the front end of the car as she tried to run across ahead of the car?
"A. The front end.
"Q. Yes.
"A Yes, sir.
"Q. That is true?
"A. That is true."

Iris, the deceased child, "lacked three months to be 12, at the time of the accident."

"Q. Now, you told Mr. Kernan, the lawyer for the railway company that your sister broke away and ran in front of the car, did you understand him when he asked you about that?
"A. Yes, sir.
"Q. Then tell me just what your sister did.
"A. She was standing next to me, and the car was coming, and she ran in front of the car.
"Q. How far away was it when in front of it?
"A. It was not very far.
"Q. Was it as far as between you and me?
"A. About that far. (12 feet by actual measurement.)
"Q. Now, before Iris crossed the track what happened, what part of the car struck her?
"A. The front part.
"Q. And do you know what it was

that struck her, the bumper, the fender, or what?

"A. The fender.

"Q. What part of the fender, the back part of the fender where it was hooked to the body of the car?

"A. Yes.

"Q. You understand me?

"A. Yes, sir.

"Q. It was not the front end of the fender but the back part where it is hooked to the car?

"A. Yes, sir.

"Q. She didn't get on the track at all, did she?

"A. No."

Louis F. Hargus, the plaintiff testified as follows:

"Q. What was the condition of Iris, as to health and intelligence?

"A. Intelligent, robust, and stout, just like her little sister, that left here a minute ago (from the witness stand).

"Q. They were both very bright?"

This closed the testimony on behalf of plaintiff.

The defendant introduced John Weilbrenner, the motorman on the car on the occasion of the accident. He had been a motorman "going on fourteen years." They usually feed up nine points, and when they approach Derbigny Street they cut off the power and slack down to about half speed, ringing the gong; when he reached Derbigny Street there was no one in the way, he was not going to stop at Derbigny Street because he was late and was picking up passengers at every second corner; he describes the accident as follows:

"I was crossing over Derbigny Street, I suppose we were going ten or twelve miles an hour; the front of our car was just past the place where people stand to board the cars, when the little girl came running from the Canal track, on the church side of our track, and it looked as if she wanted to pass in front of the car, I then quickly applied the air, reversed the car and dropped the fender, when she struck about the middle of the fender and fell right alongside the fender."

When he stopped the rear end of his car must have been about eight or ten feet from the cross walk; when he passed Roman Street he fed up his car to nine points, but as he approached Derbigny Street he reduced it to half speed; nine points mean a speed of 20 or 25 miles; when he reached Derbigny Street he shut off the power and "let the car coast"; the child came running from the church side of his car, she ran diagonally, not directly, across and he applied his brakes and she tried to get ahead of the car; the front part of the car was just where the people stand to take the car when the little girl started to dash as if she wanted to run ahead of the car, there was some people standing at the crossing to take the car; the distance between the uptown and downtown tracks is about nine feet; the front of his car stopped at about 55 feet from the crossing, the car is about 55 feet or 46 feet long; the child struck about the center of the side of the fender on the left hand side of the car; the space between her knee and her ankle is what struck the fender; a gentleman came up and asked him to back the car just about 12 inches so they could get her out.

Mrs. A. M. Anseman is a stenographer for the Standard Motor Finance Company for the last three and a half years; she saw the accident, she had left the church and had crossed the street, and was waiting for the inbound trail right at the corner where the accident occurred to take the Esplanade car going towards the river; the accident happened on the city side of her and the church side of the track and river side of Derbigny; the child evidently

thought the car was going to stop, and she cut diagonally across while the car was moving and gave no evidence of stopping; when the child started to run the car was practically right on her; the accident happened "in a flash of the eye," it was very quick; when she first saw the child she was on the cement pavement that crosses the neutral ground right between the two tracks and she started running diagonally towards the uptown track; she did not get over more than four of her steps; the car was coming at such a rapid rate of speed it would not take long to get where she was standing; she heard no bell; the car was running extremely fast; when the car stopped the end was about 20 feet from the pavement that crosses Canal Street on the river side of Derbigny Street.

James Daniels is a performer in the Fields Minstrels; his home is on Canal Street on the lower side two and a half blocks beyond Derbigny Street; he left his home and was walking towards the church; he heard a scream and looked up; then he saw a little child go forth and dive in front of a car and he turned his head away; they call "dive" in their business when a person in front of a car tries to get away and pulls back; she was trying to get away but it was too late; he saw the child go into the car with her hands spread out that way (illustrating) and then he turned his head away; his recollection is that it was the edge of the car, the downtown front corner of the car, that struck the child.

D. C. O'Dowd denied that he had asked Lavigne to testify to something that was not true.

E. Peyret, also an employee of the defendant, also denied that he had asked Lavigne to testify to something that was not true; he discharged Lavigne "for running into the rear end of another car."

James Martin is in the employ of the defendant in the electric meter department; he was not at the time of the accident; he reached the accident in the car following the one in the accident; when this last car stopped the rear end was two feet from the crossing.

Leon Gerard, motorman for defendant, testified that he was coming from the river on a Canal Belt car; he saw the car that had been in the accident, he got there nine minutes after 12; the rear end was about 15 feet from the Derbigny Street crossing.

Louis Maureau was a conductor on defendant Canal Street car going towards lake; he arrived on the corner of Derbigny and Canal Streets a few minutes after the accident; he noticed that the car in the accident was ten feet from the intersection of Derbigny Street.

Louis Letellier, conductor on defendant's car in the accident; they were three minutes late; they were making skip stops; before reaching Derbigny Street he felt the motorman throw off his power and ring his gong; and all at once the car gave a jolt and stopped with the rear end within six and eight feet from the foot crossing of Derbigny Street; he got down and saw the child's body, her head facing the river lying by the first wheel of the rear truck on the left hand side of the car.

Vincent Alvarez, inspector of equipments for defendant; every time a car makes 1000 miles it is taken in for inspection and repairs; the day after the accident he inspected the car; the brakes were good, nothing wrong with them, he tried the car out himself from the Canal barn to the half way house and back, and it worked all right.

As stated by the learned Judge in his charge to the jury, the plaintiff cannot recover if the injury to the child was brought about by her own negligence. The authorities upon this point are so abundant that it is only necessary to refer to digests. 5 La. Dig. 523, S. 25; 11 Orl. App. 330; Dufossat vs. Berens, 18 La. Ann. 339; Daul vs. N. O. Ry & L. Co., 147 La. 1012, 86 So. 477; Leopold vs. T. & P. Ry. Co., 144 La. 1000, 81 So. 602; Borell vs. Cumberland Telegraph & Tel. Co., 133 La. 630, 63 So. 247; Harrison vs. La. Western R. Co., 132 La. 761, 61 So. 782; Conrad vs. McClintic-Marshall Const. Co., 131 La. 562, 59 So. 983.

The evidence establishes beyond a doubt that as the car crossed Derbigny Street and was proceeding along Canal Street, the plaintiff's daughter, by a sudden impulse, ran in front of the car notwithstanding the efforts of her sister to restrain her.

The jurisprudence of this State relieves a street railroad from liability when a child not capable of negligence suddenly runs across its path and is killed, not on the ground that the child is guilty of contributory negligence, but because the railroad is free from negligence. Such were the facts and the doctrine in the case of Culbertson vs. R. R., 48 La. Ann. 1376, 20 So. 902. In that case the Court said:

"The fact that a child may not be capable of contributory negligence does not always render a defendant liable upon the mere proof of the injury. The test is negligence vel non. If the defendant or the defendants' agent or employee was not negligent, it is not liable."

The more so is that the law when the injured person is capable of fault or of contributory negligence. The injured child in this case was eleven years and nine months of age, "intelligent, robust, stout, and very bright," such a child is capable of fault or negligence.

"While no one should be held to a degree of care and caution beyond his years, a boy eleven years and four months of age cannot be relieved from the exercise of all care and prudence." McLaughlin vs. N. O. & Carrollton Co., 48 La. Ann. 23, 18 So. 703.

"A bright and intelligent child eight years old is sui juris so far as negligence is concerned." Lynch vs. Knoop, 118 La. 611, 43 So. 252.

"If a girl ten years of age ran to, or hastily stepped on, a bridge while in motion, such heedless act is the proximate cause of her injury, and the fact that there was no guard or chain to warn pedestrians would not relieve the girl from the necessity of acting as is expected of a person of her age." Downey vs. Baton Rouge Elec. & Gas Co., 122 La. 481, 47 So. 837.

"Contributory negligence may be laid at the door of a young preson ten years and nine months of age." Cusimano vs. City of N. O., 123 La. 565, 49 So. 195.

But the evidence does not show that the defendant was running at an excessive rate of speed. The preponderance of the testimony is that the car was running at its usual speed, and that it slowed up as it came to Derbigny Street. This testimony is confirmed by the fact that the car was stopped within a short distance after the accident. The only witness who says that the car was running fast was Mrs. Anseman, but she is not corroborated.

But even if the car was running fast, its speed does not diminish the negligence of the deceased child. The car was coming in open view to her sister and to all the other witnesses.

To attempt to cross in front of it was the height of imprudence on her part.

2nd. The testimony as to the ringing of bells is conflicting. The motorman swears he rang his bell and the conductor says he heard it. Other witnesses say they

did not hear any bells. Their testimony is negative. But what if no bells were rung? The ringing was to attract attention, and the car had been seen by all the persons at or near the corner.

3rd. The motorman was 61, but was not old, for he had no infirmities. Mrs. Anna says he used glasses, but she is contradicted by the motorman himself and the other witnesses. He told the time in the court room by the clock 32 feet away from him, and read the print on the calendar on the wall without the use of glasses. He had been a motorman fourteen years.

4th. There were fenders on the car, in working condition and the same that were used at that time and years before. The motorman says he dropped the fender, but that the girl fell on the side of it. Act 119 of 1912, p. 142, does not specify the kind or quality of fender to be used. No other fender is suggested, nor assurance given that another fender would have saved the girl's life. The case of Cannon vs. City, 144 La. 288, 80 So. 540, is very much in point. The syllabus reads:

"When a child less than six years of age catches on behind a truck drawn by mules which are trotting at the rate of six or eight miles an hour within 4 or 4½ feet from the truck of an electric railway, and then abandons his hold upon the truck at the moment when a car is passing upon the track in the opposite direction, at the rate of ten miles an hour, and suddenly runs upon the track in front and within four or six feet of the car, and it is shown that the motorman did all that was possible, after seeing the child, to avert the impending accident but without success, there can be no recovery of damages by the parents of the child, even though the car was unprovided with a fender as required by law, since the time within which a fender could have been effectively dropped was insufficient."

In the present case there was a fender and it was dropped. The motorman, Weilbrenner testified: "It looked as if she wanted to pass in front of the car, and I then quickly applied the air, reversed the car, and dropped the fender."

5th. The brakes of the car were in good order as well as all other parts of the car. We can perceive no negligence on the part of the defendant.

It is therefore ordered that the judgment herein be reversed and avoided; and it is now ordered that there be judgment in favor of the defendant, the New Orleans Public Service, Inc., rejecting plaintiff's demand at his cost.