314 So.2d 441 (1975)
George KONTOMITRAS, Individually and as the Administrator of the Estate of his minor son, Forrest Kontomitras
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 6740.
Court of Appeal of Louisiana, Fourth Circuit.
June 11, 1975.
*442 Kronlage, Dittmann & Caswell, Charles A. Kronlage, Jr., New Orleans, for plaintiff-appellee.
C. B. Ogden, II, New Orleans, for defendant-appellant.
Before SAMUEL, LEMMON and BOUTALL, JJ.
SAMUEL, Judge.
George Kontomitras instituted this suit, individually and as administrator of the estate of his minor son, Forrest, against New Orleans Public Service, Inc. to recover the cost of medical expenses for himself and damages for personal injuries sustained by the boy as a result of a pedestrian-bus accident. Following trial to a jury, judgment was rendered in favor of plaintiff in the sum of $125,000. Both litigants have appealed, the defendant solely on the question of liability, while the plaintiff seeks an increase in quantum.
Testimony relative to the occurrence of the accident was given by the minor (nine years old at the time of the accident); Margaret Dugas, driver of an automobile next to the bus at the time of the accident; Vincent Aiola, the bus driver; Dorothy Stovall and Marian Gelpi, passengers on the bus; and Elmore Poche, the investigating police officer.
The accident occurred on October 11, 1972 at approximately 8:27 a.m. on the lake side of St. Claude Avenue between Bartholomew and Alvar Streets in the City of New Orleans. In that area St. Claude is a four-lane highway divided by a substantial neutral ground. Each side of the avenue contains two lanes for moving traffic and a parking lane adjacent to the sidewalk curb. The area is a school zone.
Young Kontomitras and two of his school mates were on their way to their grammar school located on the lake side of St. Claude between Alvar and Pauline Streets, one-half block from the scene of the accident. They had crossed from the river side of St. Claude at Bartholomew, entered the neutral ground at that point and walked along the neutral ground adjacent to the lake side traffic lanes of St. Claude. The school bell rang when they were midway between Bartholomew and Alvar. At that time traffic in the St. Claude lake side lanes was stopped for a red light at Alvar. Forrest left the neutral ground and proceeded to cross the lake side lanes of St. Claude through the stopped vehicles. On two occasions as he crossed he turned and motioned to his two friends on the neutral ground to join him.
The defendant bus had been traveling uptown in the right, lake side traffic lane on St. Claude (proceeding in the direction of Alvar and Canal Streets) at approximately 10 miles per hour, and had moved over into the parking lane next to the curb when it was a full block from Alvar. Proceeding in the parking lane, the driver reduced his speed to 3 to 5 miles per hour. He noticed the three children on the neutral ground at the time he entered the parking lane and saw Forrest step into the street when the bus was approximately 25-35 feet from the eventual point of impact. He "fanned" his brakes to slow the bus, and observed the boy cross over in front of the two lanes of stopped traffic but lost sight of him thereafter.
Young Kontomitras did not see the bus until he walked (a "fast" walk) into its left side, just in front of the left front wheel, as he crossed over into the parking lane. The wheel rolled over his left side and the right calf area of his leg causing serious, permanent injuries. The precise point of impact was 187 feet from the corner of Alvar Street (or conversely 106 feet from the corner of Bartholomew Street), and approximately 8 feet 6 inches from the sidewalk curb of St. Claude. The bus stopped within approximately 2 feet after the impact.
In this court the issues are: (1) whether the bus driver was guilty of negligence; if he was, (2) whether there was contributory *443 negligence on the part of the boy; if there was contributory negligence, (3) whether the doctrine of last clear chance is applicable; and if the defendant is liable, (4) whether the quantum should be increased.

NEGLIGENCE OF THE BUS DRIVER
The general rule with regard to the duty imposed upon a driver in an area known to be frequented by children has been stated as follows:
"The duty to exercise greater than ordinary care to avoid injury to a child does not become operative or exist in favor of such child until his presence is known or should have been known under the existing facts of the particular case to the operator or driver of a motor vehicle. The motorist, upon discovering the presence of children in his path of travel or in a position where they could become imperiled, is under a duty to exercise the highest degree of care to avoid injury to them. Each case must be adjudged on the facts peculiar to it. No one case is absolutely controlling of another, as few cases are identical factually."[1]
By his own admission the bus driver saw the boy leave the neutral ground when the bus was approximately 25 feet from the point of impact and observed him cross in front of the two lanes of stopped traffic. To reach the other side of the street, and that was his obvious intention, the boy had to cross the parking lane.
Expert testimony of James Walsh, Jr. and John Exnicious, traffic engineers, indicate the stopping distance of a bus traveling 5 miles per hour ranges from 1.-99 feet to 2.35 feet (depending on brake wear) and, allowing for reaction time, the stopping distance is no more than 7.85 feet. The bus could have been stopped prior to the accident and the high degree of care imposed on its driver under all of the circumstances required such a stop. In addition, the bus was traveling in a parking lane in clear violation of a city ordinance.[2] Accordingly, we find the bus driver was guilty of negligence which proximately caused the accident.

CONTRIBUTORY NEGLIGENCE AND LAST CLEAR CHANCE
Young Kontomitras, nine years of age at the time of the accident and of normal intelligence was capable of being guilty of contributory negligence which would preclude recovery of damages of the type herein sought.[3] In determining negligence and/or contributory negligence of a child, the actions of the child must be judged by his maturity and capacity to evaluate circumstances. The degree of caution expected of a nine year old boy varies with the circumstances of each case.[4]
Defendant strenuously contends young Kontomitras was guilty of contributory negligence, which prevents any recovery by the plaintiff, in that the boy: (1) was in *444 violation of R.S. 32:213, subd. B;[5] (2) failed to watch where he was going; (3) failed to look at the road ahead of him instead of turning back to motion to his friends on the neutral ground; and (4) walked into the side of the bus which he did not see.
We find it unnecessary to consider the issue of whether or not young Kontomitras was guilty of contributory negligence. For even assuming, without deciding, there was such negligence on his part, we are satisfied the doctrine of last clear chance is applicable.
Under our settled jurisprudence, a litigant relying on the doctrine of last clear chance or discovered peril has the burden of proving all facts and circumstances necessary to its application and, before the doctrine can be invoked, these three essential facts must be established by a preponderance of the evidence: (1) the person invoking the doctrine (here the plaintiff) was in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) the person against whom the doctrine is invoked actually discovered or was in a position where he could and should have discovered such other person's peril; and (3) the person against whom the doctrine is invoked could have avoided the accident with the exercise of reasonable care.[6]
Here, the boy was in a position of peril of which he was unaware (the record establishes the fact that he did not expect to encounter moving traffic in the parking lane near the center of the block); his peril was known to the bus driver who saw the child step off the neutral ground and proceed to cross the street; and the accident could and should have been avoided by a prompt application of the bus's brakes when the driver saw the boy cross the two lines of stopped traffic in his attempt to cross the three lake side lanes of St. Claude.

DAMAGES
With respect to damages, the total jury award of $125,000 is not broken down or itemized. However, it was stipulated plaintiff incurred medical expenses totaling $19,821.61.
Testimony relative to injuries was given by Dr. Joseph Licciardi, an orthopedic surgeon, Dr. Robert Davis, a psychiatrist, and Dr. George W. Hoffman, a plastic surgeon. The report of Dr. Robert J. Meade, a plastic surgeon, was introduced in evidence.
Dr. Liccardi testified: He first saw Forrest in the emergency room at Baptist Hospital on the day of the accident. The boy had sustained an injury to his right leg below the knee to just above the ankle in which the skin and the fatty tissue thereunder were stripped as if a glove were taken off down to the ankle level. There was a fracture of the end of the bone of the tibia and fibula, through the growth line. He had a degloving injury to the left leg from the groin down to just above the knee, and bruises and abrasions. There were no internal injuries. An operation was performed to debride (cleanse) the wound, to repair the fracture of the ankle and the lacerations of the skin, and to surgically remove badly damaged tissue at the ends of the lacerations. Additional incisions in the skin were made to allow any accumulation of fluid or infection to drain. The operation took approximately two hours under general anesthesia. Two days later all of the dressings were removed, bandages taken off, the drains rearranged and the wound redressed under general anesthesia. Consultation with Dr. Hoffman, *445 a plastic surgeon, was advised because of the obvious need for reconstructive work.
Dr. Licciardi has continued to follow the patient relative to orthopedic problems. He found no disturbance at the time of trial in the growth of the musculature of the bone or any loss of motion to the joint of the hip, the knee, or the ankle on the left side. However, on the right side the right ankle does not move through a normal motion as compared to the other ankle. This is a permanent loss attributable to the stiffness and swelling of the tissues in and around the ankle and tightening of the heel cord. In addition, the growth line in the ankle is closing a little early. He does not believe that this will make any difference in the length of the leg but the ankle growth line is tilted. While this may not make any difference, it may, over the years, become arthritic. Forrest's major problem is that being grafted, his skin serves only as a protective coating, is prone to injury and is slow to heal. It does not protect him in the same way as natural skin. It does not have feeling, sense heat or cold, or sweat. The skin is live but it is not normal skin which is twenty times better than grafted skin. Forrest connot participate in contact sports, and the appearance of his skin will never be normal.
Dr. Hoffman first saw the boy several days after his admission to the hospital. At that time it was decided that since the skin was not living it would have to be removed. There was some infection present and several operations were performed prior to the skin graft. The first one, a debridement, on October 21, 1972, excised the dead tissue and cleaned out the wound. A second operation on October 24, 1972 renewed all of the dressings and applied stored pigskin, a temporary biological dressing or a temporary skin graft to the extremities to reduce the amount of fluid loss and serve as a barrier against further infection. On October 31, 1972, the doctor took 4 × 8 inch pieces of the boy's own skin from another part of his body (referred to as a "drum" of skin) and expanded that skin to cover some of the injured areas. This was the beginning of the actual grafting process. In all, the boy had a total of 13 drums of grafted skin and a total of 15 operations from the date of the accident, October 11, 1972 through November 28, 1972. He remained in the hospital until December 23, 1972. Thereafter he went two or three times weekly to receive whirlpool baths. He was readmitted to the hospital in October, 1973 because of an infection in one leg which did not heal. As of December 27, 1973, he had completely healed and was doing satisfactorily. The skin, not only on the leg but on the donor sites (i. e., that part of his body from which the skin grafts were taken), had thickened forming a heavy scar which in the passage of time had improved and softened. However, the skin will never be normal and the scarring will be permanent.
Dr. Davis saw the boy on one occasion in April, 1974, for a period of one hour. He discussed the accident with him and in the doctor's opinion Forrest has done well with the overwhelming psychological stress of the accident and subsequent major disfigurement. Dr. Davis was concerned that as he continues to grow and especially to move from latency to puberty and early adolescence, with the subsequent interest in his body and the awareness of his body as a sexual object, Forrest will undergo significant stress as his interest in girls increases with the probable rejection that will occur because of the massive disfigurement. He felt there was a high probability of the need for intensive psychiatric treatment 3 to 4 times per week for 2 to 3 years when the boy reaches 15 or 16 years of age, at a cost of $33,000.[7] No treatment is necessary at this time as the boy is progressing satisfactorily.
*446 Dr. Meade's report indicates he saw the minor on May 18, 1974. The grafts and scars were causing some limitation of activity and there was permanet disability due to loss of facia and characteristics of the skin graft, with disfigurement from the chest down. The patient's condition would probably present problems if he was to attempt hard manual labor, or if it were necessary for him to stand for prolonged periods.
In connection with our determination of whether or not the award for damages is inadequate, and in accordance with the doctrine enunciated by the Supreme Court of Louisiana in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149, and subsequent cases, we have considered the amounts of awards granted or approved by appellate courts of this state with somewhat similar injuries in other cases of serious injuries in order to decide whether or not there has been an abuse of the "much discretion" given to the trier of fact by LSA-C.C. Art. 1934(3).[8]
We are of the opinion the award does reflect the serious, permanent injuries sustained by the minor and is not so inadequate as to constitute an abuse of that discretion by the jury.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.
LEMMON, J., concurs with written reasons.
LEMMON, Judge (concurring).
This case does not involve the controversial "unconscious last clear chance", in which an inattentive plaintiff is injured by an inattentive defendant who should have discovered plaintiff's peril (but did not). Jackson v. Cook, 189 La. 860, 181 So. 195 (1938); Restatement (Second), Torts § 479 (1965); see also denial of certiorari in Nixon v. Southern Rwy. Co., La., 293 So. 2d 182 (1974).
This case is more properly one of "discovered peril", in which the plaintiff's dangerous action is actually discovered and appreciated by the defendant in time to avert the accident in the exercise of due diligence. In such a case defendant has a superior knowledge of the peril and a consequently greater ability to avoid the injury. Rottman v. Beverly, 183 La. 947, 165 So. 153 (1935).
The doctrine of discovered peril, which is based on the defendant's greater degree of fault (or, in other words, his comparative negligence), is actually a partial application of C.C. art. 2323. Unfortunately for the defendant in this case, Louisiana courts have only partially implemented C. C. art. 2323 by relieving a plaintiff under these circumstances of the consequences of his contributory negligence, rather than fully implementing the article by reducing the "damage . . . according to circumstances. . ."
My point is that full implementation of C.C. art. 2323 would not soley benefit either plaintiffs or defendants, but would serve the cause of justice.
The doctrine of last clear chance has been applied or rejected in numerous cases without much consistency of reasoning. In my opinion the doctrine is an irrationally conceived and inequitably applied stepchild of the common law marriage between contributory negligence and Louisiana tort law, designed to mitigate the harshness of contributory negligence. Today, doctrinal tort writers are almost unanimous in condemning contributory negligence, perhaps the only point of controversy being whether *447 comparative negligence should be adopted by the courts or the legislature.[1]
Codal authority for comparative negligence exists in Louisiana. Although early case law ignored C.C. art. 2323 and the error has been perpetrated, judicial interpretation of legislation is always subject to judicial correction. See concurring opinion in Broussard v. Heebe's Bakery, 263 La. 561, 268 So.2d 656 (1972).
NOTES
[1] Bean v. New Orleans Public Service, Inc., La.App., 291 So.2d 813; Campo v. Vampran, La.App., 183 So.2d 57.
[2] Section 38-91 of Chapter 38, Article VII, New Orleans City Code, 1956, as amended, provides:

"Section 38-91. Driving in parking lane not permitted.
Where parking is permitted in a lane of traffic immediately adjacent to the curb, no vehicle shall travel in such lane of traffic except for the purpose of stopping or parking, or for the purpose of making a turn, and when making a turn, only within fifty feet (50') from the intersection where the turn is to be made."
[3] See Hargus v. New Orleans Public Service, 9 La.App. 117, 118 So. 847; Tate v. Hill, La.App., 197 So.2d 107; Lawrence v. Core, La.App., 132 So.2d 82.
[4] See Plauche v. Consolidated Companies, 235 La. 692, 105 So.2d 269; Cusimano v. City of New Orleans, 123 La. 565, 49 So. 195; Tate v. Hill, La.App., 197 So.2d 107.
[5] LSA-R.S. 32:213, subd. B provides: "Between adjacent intersections at which traffic-control signals are in operation pedestrians shall not cross at any place except in a marked cross walk."
[6] Tabor v. Southern Farm Bureau Casualty Ins. Co., La.App., 281 So.2d 824; Demandre v. Robinson, La.App., 220 So.2d 542; Glatt v. Hinton, La.App., 205 So.2d 91; Tate v. Hill, supra, footnote 3.
[7] We simply report, without comment, this testimony relative to the cost of possible future psychiatric treatment.
[8] Spizer v. Dixie Brewing Co., La.App., 210 So.2d 528, and cases cited therein [see particularly, e. g., as to serious and permanent injuries].
[1] See 21 Vand.L.Rev. 889 (1968) for separate discussions of this problem by six distinguished tort scholars, Fleming James, Jr., Harry Kalven, Jr., Robert E. Keeton, Robert A. Leflar, Wex S. Malone and John W. Wade.