DOMENGEAUX, Judge.
Plaintiff, Essay P. Trahan, individually, and on behalf of his minor son, Sammy P. Trahan, sued the defendants, Gulf Insurance Co. and State Farm Insurance Co., for injuries Sammy Trahan sustained while on the property of Sammy’s grandfather, Mr. Leon Vice, Sr. Gulf and State Farm are the homeowner liability carriers for Leon Vice, Sr. and his son Alphay Vice, respectively. From a jury verdict holding Leon Vice twenty percent negligent, Mr. and *1166 Mrs. Trahan (Sammy’s parents) fifteen percent negligent each, Alphay Vice zero percent negligent, and Sammy Trahan fifty percent contributorily negligent, the plaintiffs have appealed arguing that the jury committed manifest error in attributing a total of eighty percent of the accident’s fault to Sammy and his parents. The plaintiffs have also appealed the damage award of $45,000.00 as so low as to constitute an abuse of the jury’s discretion. Additionally, the plaintiffs have argued that the Trial Court committed reversible error when it failed to provide counsel an opportunity to object to the renumbering of questions on a special jury verdict form which had previously been agreed to by counsel.
FACTS
Essay and Carolyn Trahan reside in Vin-ton, Louisiana, with their three children. Carolyn Trahan’s father, Leon Vice, Sr., resides two houses away from the Trahans. Leon’s son and Carolyn’s brother, Alphay Vice, resides on the property in between his father and the Trahans.
On the evening of March 6, 1985, Leon Vice, then 82 years old, spoke to his daughter, Carolyn Trahan, about tearing down a small garden tool shed that he felt had become an eyesore on his property. Mrs. Trahan’s second child, Sammy, a fourteen year old eighth grader in the learning disability program in school had just been suspended for two days for fighting in school. Mrs. Trahan assigned the task of tearing down the shed to Sammy, believing that the project would be a good way to keep Sammy busy for the two days of his suspension.
Early the next morning, Sammy arrived at his grandfather’s house. Pursuant to his grandfather’s instructions, Sammy proceeded to remove all of the garden tools in the shed and placed them in another nearby workshop shed. Mr. Vice went inside around 11:30 a.m. to prepare lunch and did not venture outside again that day. After lunch, Sammy’s mother came over and helped Sammy move the remaining tools and dismantle the shed’s tin roof. Sometime during this day in the garden shed, Sammy found an axe with a rotten wooden handle. Sammy stated that he showed this axe to his grandfather soon after finding it and that his grandfather told him that there was another axe handle for this axe in his workshop shed. Sammy’s testimony at the trial differed from his deposition testimony as to exactly when on this day he found the axe and when he showed it to his grandfather. Contradicting his grandson, Leon Vice testified that he did not remember being shown the axe, he did not own the axe and, in fact, the first time he remembered seeing this axe was two days after the accident.
Although Sammy admitted that his grandfather did not specifically tell him to change the handle, Sammy interpreted his grandfather’s reference to another handle to mean that he should change the axe handle in order to use the axe in the shed dismantling. Sammy placed the axe in the workshop shed until he had an opportunity to repair it. Mrs. Trahan stated that she did not see this axe when she helped Sammy that afternoon and that she had no idea Sammy intended to repair anything. Sammy and his mother ceased working when it started to rain in the early evening.
Around 9:00 a.m. the next morning, Sammy arrived at his grandfather’s house to finish dismantling the shed. Leon Vice greeted Sammy but went into town soon thereafter. Approximately fifteen minutes later, Uncle Alphay, who had seen Sammy working, came over to help Sammy finish the job. Alphay testified that when he arrived, the shed had been completely dismantled and the only remaining work was to remove nails from the boards and stack the wood into usable and nonusable piles. Both Alphay and Mrs. Trahan testified that an axe was not necessary to complete the job.
Nonetheless, unknown to Alphay and about ten minutes after his arrival, Sammy entered the workshed in order to repair the axe handle. Before leaving that day, Leon Vice had given Sammy the keys to a small tool cabinet in the workshop shed. Mr. Vice stated that he did not know why had Sammy wanted the keys but since Sammy *1167 had permission to use the workshop at any time, he did not question Sammy further. From this tool cabinet Sammy obtained a ball-peen hammer. After placing the axehead in a vise he proceeded to hit the wooden handle with the hammer in order to dislodge the handle. Apparently Sammy mishit the axe handle and struck the axehead, causing a metal fragment from the axehead to fly into Sammy’s left eye. Sammy immediately tried to flush out the fragment but failed. He quickly returned home without telling Alphay of the accident. Alphay testified that, after exchanging hellos, he never saw Sammy again that morning, was unaware that Sammy had been in the workshop, didn’t see him leave and did not know of Sammy’s accident until three days later.
The next day Sammy was taken to Lake Charles where he was seen by an ophthalmologist, Dr. William Iglinsky. He was subsequently taken to Houston for eye surgery performed by Dr. Alice McPherson. As a result of Sammy’s accident the plaintiffs have incurred $29,926.72 in medical expenses. Doctor Iglinsky estimated that Sammy’s left eye will have a five to ten percent permanent loss of vision or 20/25 to 20/30 vision.
FAULT AND QUANTUM
The jury found Sammy to be fifty percent contributorily negligent in causing the accident. Mr. and Mrs. Trahan were assessed fifteen percent negligent each. Leon Vice was held to be twenty percent negligent and Alphay Vice was considered free from fault. The jury awarded the plaintiff $45,000.00 in total damages which, after reduction for their own percentages of negligence, amounted to an award of $9,000.00. The plaintiffs have appealed both the allocation of fault and the damage award as a manifest abuse of the jury’s discretion.
Initially, we note that the plaintiffs have failed to assign as an error or address in their brief whether or not the jury was manifestly erroneous in finding Alphay Vice free from fault. The Court of Appeal will review only issues which were submitted to the Trial Court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise. Rule 1-3, Uniform Rules, Courts of Appeal. After reviewing the record we do not feel that the interest of justice requires such a review. Therefore, the correctness of the jury’s determination that Alphay Vice was free from fault will not be addressed on appeal. Hence, this ruling is final.
The plaintiffs argue that the jury’s allocation of fifty percent contributory negligence to Sammy, thirty percent fault to his parents and only twenty percent fault to Leon Vice was manifest error and that we should reverse this finding. The jury’s finding of fact should be affirmed unless characterized by manifest error, and should not be upset except in the most compelling and clearest case of error. Arnold v. T.G. & Y. Stores Co., 466 So.2d 529 (La.App. 3rd Cir.), writ denied, 470 So.2d 126 (La.1985).
The plaintiffs argue that Mr. and Mrs. Trahan did not act negligently since a parent is not the insurer of the safety of his or her own child but is only required to use reasonable care commensurate with the reasonably foreseeable risks of harm. Ryals v. Home Ins. Co., 410 So.2d 827 (LaApp. 3rd Cir.), writ denied, 414 So.2d 375, 376 (La.1982).
After reviewing the evidence, we disagree with the plaintiff’s contention and find no manifest error in the jury’s finding that Mr. and Mrs. Trahan were each fifteen percent at fault in causing the accident. While it is correct that Leon Vice requested that his children demolish the shed, it was, in fact, Mrs. Trahan who assigned the task to Sammy. Mr. Trahan was also made aware of Sammy’s task prior to the accident. If the Trahans believed that Sammy needed supervision, it was their responsibility to either provide or arrange for this supervision. Even if the Trahans had assumed that Leon Vice would provide adequate supervision over Sammy, Mrs. Tra-han was put on notice the day before the accident that no such supervision was taking place when she helped Sammy take off the shed’s roof and saw that her father *1168 was not present. Additionally, both Mr. and Mrs. Trahan knew that because Leon Vice had substantially progressed in age, he less frequently supervised those persons on his property. Hence, it was unreasonable for them to expect Leon Vice to supervise their fourteen year old son on this occasion, much less provide the proper kind of supervision. Therefore, we find that the jury’s allocation of fifteen percent of the negligence to each parent is amply supported by the evidence and hence, is not manifestly erroneous.
The plaintiffs also argue that the jury committed manifest error in determing that Sammy was fifty percent contributorily negligent.
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. Dupas v. City of New Orleans, 354 So.2d 1311 (La.1978), U.S. cert. denied 440 U.S. 971, 99 S.Ct. 1534, 59 L.Ed.2d 788 (1979). Children as young as nine years old have been held to be capable of contributory negligence, but the child’s action must be judged by his maturity and capacity to evaluate the circumstances in each particular case and he must exercise only the care expected of his age, intelligence and experience. Brantley v. Brown, 277 So.2d 141 (La.1973); Ryle v. Potter, 413 So.2d 649 (La.App. 1st Cir.1982); Kontomitras v. New Orleans Public Service, Inc., 314 So.2d 441 (La.App. 4th Cir.1975).
Sammy was fourteen years old at the time of this accident. Although he was in the learning disability program in school, Sammy was not mentally deficient. He was originally placed in these classes due to his spelling problem and, after the accident, due to his “attitude problem”. Sammy testified at his deposition that he knew he should have worn glasses in order to protect his eyes when he was repairing the axe. He also stated at the deposition (which he later denied at the trial) that he owned a pair of prescription glasses located at home, less than five minutes away, but he decided not to retrieve them before undertaking his repair work. Obviously Sammy was very aware of the danger of flying fragments, he had the means available to reduce the risk of harm and he carelessly chose not to do so. Additionally, Sammy’s trial testimony that his grandfather had not specifically told him to change the handle, but had only informed him of the existence of another handle in the workshop and the unanimous testimony of all observers that an axe was not needed to tear down the shed indicates that Sammy misinterpreted his grandfather’s statement and acted unreasonably in attempting to repair the axe without instructions, supervision or even the need for an axe in his work project. We find no manifest error in the jury assessing Sammy with fifty percent of the fault of this accident.
Mr. Leon Vice was held to be twenty percent negligent in causing Sammy’s accident. Mr. Vice testified that he did not remember seeing the axe in question prior to the accident nor telling Sammy of another available axe handle. In fact, he denied even having another handle for this type of axe. However, he admitted that because of his failing memory, it was possible that such a conversation took place. This admission by Mr. Vice provided a basis on which the jury could attribute part of the accident’s fault to him. Hence, we find no manifest error in the jury’s determination that Mr. Leon Vice was twenty percent negligent.
The plaintiffs next argue that the jury’s award of $45,000.00 in total damages was so low it constituted an abuse of discretion. The plaintiffs ask this Court to increase the award and cite several cases for quantum guidance.
Before a Court of Appeal can disturb a quantum award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award; only after making such a finding can the appellate court disturb the award and then only to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, 341 So.2d 332 (La.1976).
*1169 The plaintiffs established that Sammy incurred $29,926.72 in medical expenses. Sammy’s total vision loss to his left eye will be between five and ten percent and he will continue to need a yearly checkup. The plaintiffs tried to establish that Sammy had been deprived of his long sought after career goal of being a helicopter pilot because he no longer had the 20/20 vision job prerequisite. However, Sammy earlier testified in his deposition that for the past three years he had been interested in computers and never mentioned any interest in helicopters. Sammy’s only other damage was an “attitude problem” he was experiencing over his inability to adjust to the loss of 20/20 vision in his left eye. He testified at trial that this attitude problem caused him to have suicidal ideation; a problem he specifically and emphatically denied having when deposed earlier. Sammy’s usually low grades even improved slightly after the accident but, thereafter, declined even lower than usual.
The jury awarded Sammy a total damage award of $45,000.00. The only in-disputedly established damages were the past medical expenses of $29,926.72, future yearly eye examinations, a 5 to 10 percent permanent loss of vision in his left eye and an indeterminate amount of pain and suffering. Assuming that the award of $45,-000.00 included the full amount of past medical expenses, Sammy was awarded $15,073.28 for his remaining damages. A review of cases involving similar injuries indicates that this amount, arguably within the lower spectrum, does not appear to be an abuse of discretion. See Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App. 2nd Cir.1987) where the plaintiff was awarded $20,000.00 for his pain and suffering, a damaged cornea and a permanent glare problem in his left eye, and Broussard v. Peltier, 479 So.2d 679 (La. App. 3rd Cir.1985) where this Court raised an award from $5,000.00 to $30,000.00 for the plaintiff’s permanent loss of vision in her left eye from 20/20 vision to 20/200 vision.
Finally, the plaintiffs argue that the Trial Judge committed reversible error when he renumbered the questions listed on the special jury verdict form without first allowing counsel an opportunity to object to the renumbering prior to its submission to the jury. This argument is completely without merit. A review of the record shows that the Trial Judge held an in-chambers conference, with all attorneys present, to allow counsel the opportunity to object to the questions in the proposed special jury verdict form. Various counsel objected to three of the questions on the form and the Trial Judge agreed to omit these questions. Prior to submitting the revised special verdict form to the jury, the Trial Judge had the form retyped without the three objectionable questions and, in the process, renumbered the remaining questions in the proper sequence. The plaintiffs argue that the Trial Judge erred at this point by not submitting the retyped special jury verdict form to all counsel in order to allow them to object to this renumbering. La.C.C.P. art. 1812(B) requires that
The Court shall inform the parties within a reasonable time prior to their argument to the jury of the special verdict form and instructions it intends to submit to the jury and the parties shall be given a reasonable opportunity to make objections.
Counsel was given ample opportunity to object to the content of the special jury verdict form; the renumbering of the questions had no effect on, much less caused prejudice to the plaintiffs’ case. This assignment of error has no merit.
For the foregoing reasons, we affirm the judgment of the Trial Court. Costs on appeal are assessed to the plaintiffs.
AFFIRMED.