346 So.2d 739 (1977)
James A. O'CONNOR
v.
Dorothy E. TERRY et al.
No. 11248.
Court of Appeal of Louisiana, First Circuit.
May 9, 1977.
Rehearing Denied June 13, 1977.
Pat J. Berrigan and James R. Strain, Jr., Slidell, for plaintiff-appellant.
Timothy G. Schafer, New Orleans, for defendants-appellees Dorothy E. Terry and U. S. Auto. Assn.
Before LANDRY, EDWARDS and COLE, JJ.
*740 LANDRY, Judge.
Plaintiff (Appellant) appeals from a jury verdict judgment dismissing his claims for damages for personal injuries sustained in an accident in which a motorcycle being ridden by Appellant was struck from behind by an automobile being operated by defendant Dorothy E. Terry (Appellee), the insured of defendant United Services Automobile Association. We affirm.
The issues presented on appeal are: (1) Was Appellee exceeding the speed limit applicable at the scene of the accident; (2) Was Appellant stopped or traveling slowly along the highway without lights on his motorcycle (the accident having occurred at night); (3) Alternatively, did Appellee have the last clear chance to avoid the accident; and, (4) Alternatively, should this court reverse the long standing contributory negligence rule obtaining in our state, and allow Appellant recovery under the comparative negligence doctrine.
The accident occurred at approximately 11:30 P.M., April 11, 1974, on or near the approach of the Robert Road overpass of I-12 near Slidell, Louisiana. Robert Road is a north-south two-lane, blacktopped highway, also known as La. 1091. The overpass is situated two or three hundred yards north of the entrance to Country Club Estates, which is situated on the west side of Robert Road. At a point 648 feet north of the northernmost portion of the concrete overpass, Robert Road is intersected by an inferior roadway known as Brown Switch Road. A speed limit sign is presently situated on the West shoulder of Robert Road, about 430 feet south of Brown Switch Road, and approximately 218 feet north of the commencement of the overpass. The area is rural and somewhat wooded, especially north of the overpass. Between Brown Switch Road and the overpass, there is a slight curve in the highway. At the point of impact, the highway rises slightly. The night was dark and heavily overcast. The area north of the overpass was unlighted. The surface of the highway was dry, although rain had fallen earlier that night. To the north of Brown Switch Road, Robert Road is straight for a considerable distance. Appellant was riding a 1973 Suzuki motorcycle. While traveling south on Robert Road, in his proper lane of travel, Appellant's vehicle was struck from the rear by a 1969 Javelin two-door automobile being driven southerly by Miss Terry, who was accompanied by her guest passenger acquaintance, Sally Smith. The impact occurred virtually in the center of the southbound lane at a point approximately 135 feet north of the north end of the overpass (about 93 feet south of the speed limit sign).
Appellant, 20 years of age at the time of the accident, testified he was traveling with his lights on. He entered Robert Road from the east via Brown Switch Road after stopping at a stop sign. He looked to his right and saw no southbound vehicle approaching, despite the fact that Robert Road was straight to the north for a considerable distance. He accelerated his bike after entering Robert Road, and was proceeding south in his proper lane at a speed of about 35 to 40 miles per hour. Shortly after turning onto Robert Road, he noted a car parked on the right or west shoulder of the highway with its lights off. He saw that the hood of the vehicle was raised and he also noted two persons, whom he believed to be young girls, standing in front of the vehicle. He thought the girls were having car trouble and perhaps needed assistance. He considered stopping but proceeded ahead a short distance. He again considered stopping, and after traveling about 60 yards beyond the parked car, he decided to turn around and proceed along the shoulder to the stalled car. Preparatory to turning, he slowed the speed of his bike and looked to his rear over his right shoulder. He saw two lights about five feet to his rear and instantly he was struck from behind. He next recalled lying on the highway several feet distant from his motorcycle. In addition to his front and rear burning lights, Appellant's motorcycle was equipped with front and rear nonburning reflectors and one or more side mounted reflectors. Appellant testified he did not stop on the traveled portion of the road, and was struck before he could begin his *741 turn to the right to take the shoulder of the road.
Miss Terry, in essence, testified she was proceeding toward a local restaurant and lounge after having attended a pre-graduation party at the home of a friend who lived a mile or so north of the overpass. Although alcoholic drinks were available at the party, she did not have a drink. She was traveling in the southbound lane at about 45 miles per hour with her lights on dim or low beam. She did not notice a lighted vehicle ahead. She suddenly saw a flash of light which she believed to be a reflection. She applied her brakes but had no time to swerve her vehicle. At the moment of impact, she was unaware of the nature of the object she struck. She did not see the vehicle parked on the side of the highway. After the accident, she went to the aid of Appellant, whom she found lying on the highway partly beneath his motorcycle.
Miss Smith's testimony is approximately the same as that of Miss Terry, except that she saw the vehicle parked on the side of the highway. She did not, however, see anyone standing outside the parked car. She believes she saw one or two persons seated in the parked vehicle. Although she was looking ahead immediately before the impact, she saw no lights or any other indication of a vehicle ahead. Instantly before the impact, she noted what appeared to be a flash of light which she believed to be some sort of reflection.
The accident was investigated by Sgt. Marion F. Moore, State Police, who was familiar with the area and had patrolled this particular stretch of road on numerous occasions. He determined the point of impact to be in the center of the southbound lane, approximately 130 feet north of the north end of the overpass, in a slight curve and on a slight incline. He found 24 feet of skid marks left by the Terry car in the southbound lane prior to the point of impact. From scuff marks on the roadway, he estimated the motorcycle was pushed forward about 110 feet after the collision. He estimated Miss Terry's speed at about 50 miles per hour, and did not cite her for speeding. About 2 hours after the accident, he attempted to interview Appellant in the hospital, but limited his interrogation in view of Appellant's obvious serious injuries. He noted a slight trace of alcohol on Appellant's breath, but did not cite Appellant for any offense.

THE SPEED LIMIT ISSUE
On June 21, 1974, approximately 6 weeks after the accident, photographs of the scene were taken by Miller C. Henry, professional photographer. One photograph shows a 30 mile per hour speed limit sign situated approximately 428 feet south of the intersection of Brown Switch Road and Robert Road. The reverse side of the sign bears the legend "12/18/73". Miller testified the sign was in place the day he took the picture. He could not state when it was posted.
James Moore, District Engineer, Department of Highways, testified that department rules require each posted traffic sign be inscribed on its reverse side with the date of posting. The legend "12/18/73" indicated to him that this particular sign was erected on December 18, 1973, although he could not be absolutely certain about the matter. He indicated that records in his office should indicate the precise date of posting, but that he had not been requested by Appellant's counsel to produce these records.
Sergeant Moore did not look at the sign on the night of the accident. He assumed the speed limit was 55 miles per hour in the area. Being of the view the sign did not figure in the accident, he did not check it. He recalled the former speed limit of 60 miles per hour on Robert Road had been changed to 55 in compliance with national policy, but so far as he knew, the speed limit in the area was 55 miles per hour at the time of this accident. He believed the sign in question was a sign indicating a reduced speed zone ahead.
Miss Terry and Miss Smith testified substantially to the effect that the sign in question was a 55 mile per hour sign on the *742 date of the accident, but that it was changed to a 30 mile per hour sign 2 or 3 weeks thereafter. They indicated the sign was changed at the request of local authorities who complained that motorists traveling southerly at 55 miles per hour were endangering the lives of motorists slowing down on the south side of the overpass to enter Country Club Estates. They explained that southbound drivers proceeding at 55 miles per hour were suddenly confronted with a 30 mile per hour sign posted on the south side of the overpass between the overpass and the Country Club Estates entrance.

WAS APPELLANT'S MOTORCYCLE ILLUMINATED?
Sgt. Moore owned a motorbike the same make as Appellant's, but a size larger. He explained the lights on such a machine are controlled by the ignition switch which is operated by means of a key, and also by a control located on the left handlebar. To work the lights, the ignition switch key must be turned to an "on" position. When he arrived at the scene, about 30 minutes after the accident, the lights on the motorcycle were not burning. He found the ignition key on the "off" position. He turned the switch on and found that the headlamp burned feebly. The rear or taillight had been totally demolished and was completely inoperable.
Appellant testified that at the moment of impact his engine was running and his lights were burning. He stated the lights worked solely from the ignition key; that the switch had 3 "on" positions, one of which was for the lights; that there was no control or switch on the handlebar; and, that he did not turn off the switch after the accident because he was several feet from his motorcycle.
Miss Terry stated she found Appellant lying partly beneath his motorcycle after the accident. She saw no lights burning on the motorcycle.
Miss Cheryl Woods, an acquaintance of Miss Terry, traveling northerly along Robert Road, reached the top of the overpass at about the moment of impact, but she did not actually see the accident. She first checked the occupants of the Terry vehicle and Miss Terry told her that she did not see the motorcycle because its lights were not burning. She immediately went to check on Appellant whom she found lying partly beneath his motorcycle. She noted the lights of the motorcycle were not on. She asked Appellant if she could check to see if his lights would work. Appellant assented and turned the ignition key, following which she "flipped a switch" and the lights came on.
Appellant urges manifest error in the jury declining to find that Miss Terry was proceeding well in excess of the posted speed limit of 30 miles per hour, and that her negligence in this regard was the sole cause of the accident. Appellant also urges manifest error in the jury's failing to find Miss Terry did not maintain a proper lookout; that she failed to see his lighted motorcycle on the highway; and, alternatively, she failed to avail herself of the last clear chance to avoid the accident.
It is obvious that these contentions involve resolution of factual issues. Appellant does not allege error of law on the part of the trial court in charging the jury as to the law applicable to the facts of this case. We conclude, therefore, the jury was properly charged. It follows that the jury, in the light of a proper charge as to the applicable law, has factually determined either that Miss Terry was not negligent, or that Appellant was contributorily negligent and that Miss Terry did not have the last clear chance to avoid the accident.
Although the record contains conflicting testimony on the factual issues, we find credible evidence of record to support the obvious jury findings on the crucial issues. We certainly find no manifest error in this instance. Under the circumstances, the judgment must be affirmed. Canter v. Koehring, 283 So.2d 716 (La.1973).

COMPARATIVE NEGLIGENCE ISSUE
Appellant contends that LSA-C.C. Article 2323 establishes the comparative negligence *743 rule, but our jurisprudence has erroneously and unintentionally adopted the common law rule of contributory negligence. Appellant also relies upon a law review article by Professor Wex S. Malone, entitled "Comparative NegligenceLouisiana's Forgotten Heritage", 6 La.L.Rev. 125 (1945). Appellant additionally cites language appearing in certain of our decisions including Eubanks v. Brasseal, 310 So.2d 550 (La.1975); Kontomitras v. New Orleans Public Service, Inc., 314 So.2d 441 (La.App. 4th Cir. 1975); and Haas v. Southern Farm Bureau Casualty Insurance Company, 321 So.2d 380 (La.App. 4th Cir. 1975), which favors adoption of the comparative negligence doctrine.
The contributory negligence rule has been in effect in this state since 1841 when the Supreme Court decided Fleytas v. Pontchartrain Railroad Company, 18 La. 339 (1841). It suffices that the doctrine announced in Fleytas, above, has been followed and approved by the Supreme Court in instances too numerous to mention.
Where the jurisprudence is clear and unmistakable, this court has no authority to change the policy thereby established. In such instances, it is the duty of intermediate appellate courts to follow the law as established by the decisions of the Supreme Court. Our Supreme Court has consistently decreed that contributory negligence is a complete bar to recovery in a tort action. Assuming, arguendo, we disagreed with the jurisprudence in this regard, we are compelled to follow what is obviously a clear expression of our Supreme Court. Pringle-Associated Mortgage Corporation v. Eanes, 254 La. 705, 226 So.2d 502 (1969).
The judgment of the trial court is affirmed at Appellant's cost.
AFFIRMED.